In re KRISCH REALTY ASSOCIATES, L.P., Debtor.

LW–SP2, L.P., Movant,

v.

KRISCH REALTY ASSOCIATES, L.P., Respondent.

Bankruptcy No. 94–00176.
Motion No. 1.

United States Bankruptcy Court,
W.D. Virginia,
Roanoke Division.

Oct. 25, 1994.

## DECISION AND ORDER

ROSS W. KRUMM, Chief Judge.

This matter comes before the Court on the motion of LW–SP2, L.P. (herein "LW") for relief under 11 U.S.C. § 362(d)(1) and (2)[1] with respect to the six hotels owned by Krisch Realty Associates, L.P. (herein the Debtor). Trial was held in Harrisonburg, Virginia, on June 28, 1994. The Court has reviewed the testimony of the witnesses, the documentary evidence offered, the arguments of counsel, and all written legal authority submitted by the parties. For the reasons stated in this Decision and Order, the stay will remain in force subject to the conditions set forth in this Decision and Order.

### Procedural History

The Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code on January 31, 1994. On the same date, three related entities of the Debtor, Krisch Hotels, Inc., KR Associates, Inc., and Krisch American Inns, Inc., also filed voluntary petitions under Chapter 11. Krisch Hotels, Inc., is the general partner of the Debtor. Finally, on May 23, 1994, a fourth related entity, Sugar Bay Associates, L.P., filed a voluntary petition under Chapter 11.

The Debtor, a Virginia limited partnership, is the owner and operator of the following six hotels which are the object of LW's motion for relief: the Covington, Virginia, Holiday Inn; the Dortches, North Carolina Holiday Inn; the Lexington, Virginia, Holiday Inn; the Marion, Virginia, Holiday Inn; the Salem, Virginia, Holiday Inn; and the Charlotte, North Carolina, Sheraton (herein the "Six Hotels").

LW filed this motion for relief from the automatic stay on May 3, 1994. On June 13, 1994, the last day of the exclusivity period under 11 U.S.C. § 1121(b), the Debtor filed its disclosure statement and plan of reorganization.[2]

Mark S. Kaufman, Atlanta, GA, William B. Hopkins, Jr., local counsel, Roanoke, VA, for movant LW–SP2, L.P.

A. Carter Magee, Roanoke, VA, for debtor/respondent Krisch Realty Associates, L.P.

1. Hereinafter all code sections will refer to code sections of the Bankruptcy Code unless otherwise noted.

2. The Debtor requested an extension of the exclusivity period which was denied by order of this Court. However, the parties negotiated a brief extension in consideration of the Debtor's dismissing its appeal of the order denying exten-

### Pre–Petition Debt History

On June 26, 1992, the Debtor and its affiliated entities entered into a complex restructuring and settlement agreement (the "Settlement Agreement") with Westinghouse Credit Corporation (WCC) concerning the existing indebtedness secured by all of the hotel properties then owned by Debtor. As part of the restructuring agreement, the Debtor conveyed certain properties to WCC in exchange for partial forgiveness of the indebtedness.[3] Seven properties were retained by the Debtor[4] and the remaining debt related to the Six Hotels was restructured into first and second mortgage loans.

The principal amounts of the six restructured first mortgage loans (the "Senior Notes") were based on the value of each of the Six Hotels serving as primary collateral. The principal amounts of the six restructured second mortgage loans (the "Junior Notes") were based on the remaining indebtedness owed to WCC with respect to each property. The Senior Notes, with the exception of the Senior Note secured by the Charlotte, North Carolina, Sheraton, matured on July 1, 1994. The Junior Notes, and the Charlotte, North Carolina, Sheraton Senior Note, mature on July 1, 1996.

### The Motion for Relief

In its motion for relief, LW asserts that on the petition date, the Debtor owed it a total of $39,135,308.31, consisting of $38,698,217.93 in principal, accrued and unpaid interest of $419,337.41 [5] and accrued and unpaid late charges in the amount of $17,752.97 (herein the "Indebtedness"). In addition to first and second deeds of trust, the Indebtedness is secured by an assignment of leases, rents and profits, and security agreements in the Six Hotels.

sion. On June 24, 1994, the Debtor filed its first amendment to the disclosure statement and plan.

3. When the Debtor was formed in 1985, it acquired 23 hotel properties located in Florida, North Carolina, Tennessee and Virginia. The financing for the Debtor was provided by Westinghouse Credit Corporation (WCC) whose interest LW acquired after restructuring of the debt and reduction of the number of properties owned by the Debtor.

On May 23, 1994, LW and the Debtor entered into certain stipulations of fact for purposes of this motion. The stipulations relevant to this decision are that the aggregate fair market value of the Six Hotels is at least $3,000,000.00 less than the Indebtedness and that the deeds of trust constitute valid, properly perfected first priority and second priority liens on the Six Hotels.

### Law & Discussion

LW seeks relief from the automatic stay pursuant to section 362(d)(1) and (2). Although LW requests relief "for cause" pursuant to section 362(d)(1) in it's prayer for relief, none of its evidence, its written legal authority, or its oral argument addressed section 362(d)(1). Therefore, the Court will decide the motion for relief under section 362(d)(2).

There are two elements that must be determined under section 362(d)(2): whether there is equity in the subject property and whether the subject property is necessary for an effective reorganization.

■ The Debtor has conceded that there is no equity in the property.[6] Therefore, the burden shifts to the Debtor to establish that the property is necessary for an effective reorganization. 11 U.S.C. § 362(g)(2). Demonstrating that the property is necessary for an effective reorganization requires:

[n]ot merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization **that is in prospect.** This means, . . . that there must be "a reasonable possibility of a successful reorganization within a reasonable period of time."

4. These properties consist of the Six Hotels and the Sheraton Inn, Roanoke, Virginia, which is not collateral securing the debt owed to LW.

5. The Debtor disagrees with LW's figure and asserts that the amount of accrued and unpaid interest is actually $337,237.34, a difference of $82,100.07.

6. *See* Stipulation ¶ 10.

*United Savings Assoc. of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 375–76, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988) (emphasis in original). Furthermore, the *Timbers* Court noted that the Debtor's evidentiary burden regarding the existence of a reasonable prospect of a successful reorganization within a reasonable time increases as the bankruptcy case progresses. *Timbers*, 484 U.S. at 376, 108 S.Ct. at 633. In the context of a hearing on a motion for relief from stay, the Debtor must prove that the property is necessary for an effective reorganization by a preponderance of the evidence. *In re Cho*, 164 B.R. 730, 734 (Bankr.E.D.Va. 1994).

LW asserts that the property is not necessary for an effective reorganization because the Debtor cannot demonstrate that there is a reasonable possibility of a successful reorganization under any set of circumstances. LW argues that the Debtor cannot obtain a consensual plan under section 1129(a) because LW will control its class and will vote to reject the plan unless the plan proposes to pay its deficiency claim in full. The plan as currently proposed does not contemplate paying the deficiency claim of LW in full. Thus, the class which contains the deficiency claim of LW is impaired and the plan cannot be confirmed under 11 U.S.C. § 1129(a) over its objection. 11 U.S.C. § 1129(a)(8).

Given these circumstances, the Debtor must proceed under the "cram down" provisions found in section 1129(b). However, in order to open the portal to section 1129(b), section 1129(a)(10) requires that at least one non-insider impaired class of claims accept the plan. 11 U.S.C. § 1129(a)(10). LW's deficiency claim is classified by the Debtor's plan as an unsecured claim, but it is segregated into a class separate and apart from all of the other unsecured creditors in the case. LW argues that the separate classification of its unsecured claim is improper. In summary, LW believes that it should be in the general unsecured creditors' class with all other recourse creditors and that Debtor has set up the creditor classes solely for the purpose of using all other unsecured credi-

tors as the class of assenting creditors which will fulfill section 1129(a)(10).

### A. *The Classification Issue*

■ LW relies on section 1122(a) and case law interpreting that section for the proposition that classification of its deficiency claim is improper. Although section 1122(a) provides that a plan may place a claim in a particular class only if the claim is "substantially similar" to other claims in that class, there is no Bankruptcy Code provision that requires a debtor to place all substantially similar claims in the same class. *In re Bryson Properties, XVIII*, 961 F.2d 496, 502 (4th Cir.1992) (The Bankruptcy Code "grants some flexibility in classification of unsecured claims"). *Bryson* also states, there is a limit to the debtor's power to classify claims:

> Although the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited. There must be some limit on the debtor's power to classify creditors.... The potential for abuse would be significant otherwise.... If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed.

*Id.* Furthermore, the debtor cannot "gerrymander" or artificially impair classes of claims in order to attain an impaired assenting class. *Id. citing In re Hollywell Corp.*, 913 F.2d 873, 880 (11th Cir.1990).

The basis of the decision in *Bryson* on the claims classification issue is:

> Where all unsecured claims receive the same treatment in terms of Plan distribution, separate classification on the basis of natural and unnatural recourse claims is, at a minimum, highly suspect.[7]

*Id.* However, in reaching its decision in *Bryson*, the Fourth Circuit recognized the holding in *In Re Aztec Co.*, 107 B.R. 585, 592 (Bankr.M.D.Tenn.1989), that the "unfair discrimination" determination requires consideration of the totality of the circumstances; and that the existence of "natural" and "un-

---

7. The distinction between natural and unnatural recourse claims is discussed *infra* at 918.

natural" recourse claimants is a factor to consider but it is not outcome-determinative. *Id.* at 502, n. 9. This Court will decide the classification issue within the framework of *Bryson* as set forth above.

At trial, the Debtor offered the following justifications for separate classifications.

### 1) Recourse v. Non-recourse Debt

■ LW's unsecured deficiency claim arises out of the Junior Notes which were established under the Settlement Agreement. The Junior Notes are non-recourse notes and are turned into "recourse" claims only for Chapter 11 purposes because of section 1111(b)(1)(A) of the Code. The Debtor refers to this as an "unnatural recourse claim" which distinguishes it from the "natural recourse claims" of all other unsecured creditors.

The distinction between natural and unnatural recourse claims lies in the priorities retained by each of the claims notwithstanding their status as recourse claims in Chapter 11. Because LW's debt is non-recourse, it cannot collect from the general partner of the Debtor.[8] Conversely, all of the other unsecured creditors, which the Debtor has classified in section 3.09 and treated in section 4.09 of the plan, have a right to recourse. *See* Va.Code Ann. § 50–15(A)(2) (Michie 1994).

Under 11 U.S.C. § 1129(a)(7)(A), every creditor is entitled to receive in Chapter 11 as much as would be received in Chapter 7. Thus, the unsecured creditors in section 3.09 of the plan can take the position that they are entitled to be paid what they would receive in Chapter 7, arguably 100%. But in Chapter 7, the non-recourse claim of LW loses its pseudo-recourse status and would be entitled to look only to the collateral for recovery. This fact creates a conflict between the LW claim and the claims of all other unsecured creditors. If LW becomes a member of the class of unsecured creditors it will share pro rata with all other unsecured creditors in plan payments and will take the largest share of that class because of the size of its claim when compared to all other claims. With only one class of unsecured creditors the plan will not comply with section 1129(a)(7) because of a claim which is not entitled to be paid anything in a Chapter 7. Thus, from a practical point of view, the claims of LW and the claims of all other unsecured creditors do not appear to be substantially similar.

### 2) Payment of the Junior Notes was Subordinated to Payment of the Trade Creditors

The terms of the Junior Notes evidencing the unsecured portion of LW's claim provide that LW was to be paid from cash flow after the payment of all expenses. The Debtor argues that this is subordination of payment of the Junior Notes and, when "offered along with" the natural versus unnatural recourse rationale, justifies separate classification of LW's deficiency claim.

Debtor's argument proceeds upon the assumption that subordination of debt service payments is effectively an agreement to subordinate payment of the principal indebtedness. LW asserts that this approach was rejected in *In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr.S.D.N.Y.1982), *reargument denied*, 21 B.R. 478 (Bankr. S.D.N.Y.1982). The *Pine Lake* court held:

> In order for there to be a consensual or contractual subordination, there first must exist an agreement where a creditor and a debtor agree to create priorities among debts.... **There is no hint of any intention to subordinate the mortgagee's principal indebtedness to the claims of trade creditors....** Accordingly, the debtor's contention that the mortgagee contractually subordinated his claim ... to the claims of trade creditors is without merit.

*Id.* at 830–31 (emphasis added).

The Debtor attempts to distinguish *Pine Lake* by pointing out that the interest accru-

---

8. The Court notes that the stipulations of the parties evidence a pledge of the general partnership interest of Krisch Hotels, Inc., in the debtor to LW. However, sale of the general partnership interest would carry with it any claims of unsecured creditors of the debtor. Also, takeover of the general partnership interest by LW at a foreclosure would still require liquidation of the partnership assets and distribution to the unsecured creditors prior to distribution to general partners.

ing on the *Pine Lake* junior notes was not to be forgiven, rather it was to be added to the principal balance at maturity. *Id.* at 831. In the present case, interest was to be paid on the Junior Notes only if there was sufficient cash flow to make such payments after payment of all other operating expenses. *See* Debtor's Exhibit C, tab 3. In addition, the Debtor argues that in *Pine Lake* there was no agreement between the creditor and debtor regarding the priority in which debt would be serviced, whereas in this case the priority of payment was specifically outlined.[9]

LW states that its agreement with the Debtor does not contain language which subordinates the underlying principal indebtedness of the Junior Notes. It draws a distinction between Junior Debt Service which is defined as "... amounts required to be paid to lender pursuant to the applicable Restructured Secured Promissory Note" and principal debt. Debtor's Exhibit C, tab 1, p. 11. Also, LW argues that there was a default prepetition which rendered any agreement the parties had as to cash flow priority a nullity.

■ The Court finds that the Debtor's attempt to distinguish *Pine Lake* on a factual basis is without merit. As in *Pine Lake*, there is no specific agreement between LW and Debtor to subordinate the creditor's principal indebtedness to the claims of trade creditors. The parties merely agreed to subordinate the payment of interest on the mortgagee's claim to payment of operating expenses. Section 4.5 of the Settlement and Restructuring Agreement speaks to Junior Debt Service and not payment of the principal indebtedness as evidenced by the Junior Notes.

The *Pine Lake* court noted that bankruptcy courts have uniformly enforced *Pine Lake*-type agreements according to their terms. *Id.* at 830, *citing, In re Credit Industrial Corporation,* 366 F.2d 402, 409 (2d Cir. 1966). Based upon the wording of section 4.5 of the Settlement Agreement, the definition of Junior Debt Service, and the wording of the Restructured Junior Secured Promissory Note, this Court finds that there is no evidence of the intention of the parties to subordinate the principal debt owed to LW to the unsecured trade creditors.

However, that does not end the inquiry as to the distinction between the Junior Notes and other unsecured debt. The character of the claim evidenced by the Junior Notes was established by the parties prepetition through negotiation. The agreement gave LW secured status and divided the obligations to be secured into Junior and Senior Notes. Thus, the parties contemplated that the Junior Notes were to have an identity separate and apart from other unsecured debts. Treatment of the Junior Notes was to be different from treatment of unsecured debt. In fact, unsecured trade debt was to be paid first. This is a prepetition priority that is reflected in section 1129(a)(7) of the Code. Postpetition, it is LW that seeks to change the prepetition status established by the parties. Its only reason is to attempt to block the Debtor's access to section 1129(b). Prepetition, the parties intended to treat the Junior Notes differently from trade debt because they recognized the need for different

---

9. *See* Settlement Agreement, section 4.5, which provides:

4.5 *Cash Flow Priority.* (a) Unless and until any event of default occurs, all revenue derived from each restructured property from and after April 1, 1992, shall be applied as follows: (i) First, to the payment of Operating Expenses with respect to such Restructured Property; (ii) Second, to the payment of Senior Debt Service with respect to such Restructured Property; (iii) Third, to the payment of an Incentive Management Fee with respect to such Restructured Property; (iv) Fourth, to the payment of such expenditures for capital improvements with respect to the applicable Restructured Property to which

WCC shall have given written approval in advance in excess of the then-existing Capital Expenditure Reserve for such Restructured Property; (v) Fifth, to the payment of the Junior Debt Service with respect to such Restructured Property; (vi) Sixth, to the payment of any Excess Incentive Management Fee with respect to such Restructured Property; and (vii) Seventh, any remainder shall be distributed one-half to WCC or other holders of the restructured second mortgage loan with respect to such restructured property as additional interest, and one-half to the appropriate obligor.

treatment. There is no evidence that the reasons which motivated the parties prepetition evaporated upon the filing of Chapter 11. If the parties intended to treat the debt differently prepetition, the Debtor is entitled to classify separately to carry out that intent Postpetition.

### 3) The Junior Notes as equity

■ The Debtor also asserts that separate classification of LW's deficiency claim is justified in that the debt evidenced by the Junior Notes is in the nature of "equity interests" as opposed to debt. The Court disagrees.

First, the Debtor has agreed and stipulated throughout the course of these bankruptcy proceedings that it is indebted to LW in an amount not less than $38,000,000.00 which includes the debt evidenced by the Junior Notes. The Debtor has agreed that the Junior Notes evidence debt. Thus, the Debtor is judicially estopped from now attempting to argue that the Junior Notes should be deemed to be equity. *In re Peck*, 155 B.R. 301, 305 (Bankr.D.Conn.1993).

Second, a review of the Junior Notes does not reveal any support for the Debtor's assertion that the Junior Notes constitute an equity instrument as opposed to a debt instrument. Each of the Junior Notes is named a "Restructured Junior Secured Promissory Note," is executed by the Debtor as Borrower, is made payable to LW, contains default provisions and other terms commonly found in notes, and matures on a set date in the future.

Third, even if the Court assumes the Debtor's assertion that LW never expected to be repaid on the Junior Notes, this fact does not turn the Junior Notes into equity interests.

### 4) Insider Status

■ The Bankruptcy Code provides that an "insider" includes a "person in control of the debtor," if the debtor is a partnership, or an "affiliate, or insider of an affiliate as if such affiliate were the debtor." 11 U.S.C. §§ 101(31)(C)(v) and (31)(E). The Debtor argues that LW's predecessor in interest, WCC, had intimate knowledge of the Debtor's financial condition which allowed WCC to exercise control over the Debtor when negotiating the Settlement and Restructuring Agreement. This Court finds this argument to be without merit.

In order for a creditor to "control" a debtor so as to be considered an "insider," the creditor must be so powerful that the debtor becomes a mere instrument or agent of the creditor, unable to make independent policy and personnel decisions. *See In re Meridith Millard Partners*, 145 B.R. 682, 688 (D.Colo. 1992), *aff'd* 12 F.3d 1549 (10th Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994). The mere exercise by a lender of financial control over a debtor incident to the debtor-creditor relationship does not make the lender an insider. *In re Practical Inv. Corp.*, 95 B.R. 935, 941 (Bankr. E.D.Va.1989). In the instant case, the Debtor has not presented any evidence establishing that WCC exercised the kind of control that would make the Debtor a "mere instrument of the lender." Moreover, there is no persuasive authority that any control exercised by WCC should be attributed to LW.

### 5) Long–Term Debt v. Short–Term Debt

■ The Debtor also attempts to argue that LW's deficiency claim is in the nature of long-term debt and that LW has no reasonable expectation of quick payment, whereas general unsecured creditors' claims arise from short term debt and they expect payment on a short-term basis. The Debtor cites *In re Rivers End Apartments, Ltd.*, 167 B.R. 470 (Bankr.S.D.Ohio 1994), in support of its argument. Although *Rivers End* did allow separate classification of a creditor's non-recourse deficiency claim, the Court did not specifically state that the allowance of separate classification was due to the long-term debt characteristics of the deficiency claim versus the short-term debt characteristics of the general unsecured debt. *See In re Rivers End Apartments, Ltd.*, at 477–79. The Court notes that in almost all cases, the long term vs. short term debt issue will exist. However, in this case there was a prepetition default, the debt was accelerated and the entire balance was due. Arguably, no shorter term is possible and the distinction the Debtor attempts to draw is eliminated.

The Court does, however, see important distinctions between the types of debts and

their purposes. The unsecured debt classi-
fied in section 3.09 of the plan is trade debt
for goods and services rendered by vendors.
It is the type of debt which must be incurred
to keep the business going from day-to-day.
In comparison to the LW debt, its size is
relatively small and repayment is short term.

The debt owed to LW in the form of
Junior Debt is debt incurred to acquire the
physical assets of the Debtor. It is debt that
is incurred all at one time and debt which the
parties expect will be paid back over a long
period of time. Thus, the debts evidenced by
the two classes serve different purposes and
creditors who must vote have different rea-
sons for deciding how they will vote on the
plan. In this case, it is clear that LW's
motivation in litigating the classification issue
is to get itself into the class of unsecured
debt and block the Debtor's access to cram
down under section 1129(b). Success on
LW's part might stop this Chapter 11 dead
in its tracks, permit LW to foreclose, and
forever deny unsecured creditors an opportu-
nity to realize any recovery from Debtor.
Unlike LW, unsecured creditors have no col-
lateral which motivates them in the decision-
making process.

### Conclusion

At this stage of the Chapter 11 proceeding,
the Court finds that there are sufficient rea-
sons for separate classification in Debtor's
plan. In addition, unlike *Bryson,* the Debtor
has not structured equal plan distribution
payments to all unsecured creditors regard-
less of class.[10] In this case, the Court be-
lieves that the real battle should be joined on
the section 1129(b) playing field where it will
be more level for all creditors and the Debt-
or.

10. Under section 4.09 of the original plan, gener-
al unsecured claims will receive 50% of their
allowed claims not later than 180 days after the
effective date of the plan. The source of funding
for payment of these claims is an infusion of
capital by general and limited partnership inter-
ests. Thereafter, over a 24–month period the
balance of allowed claims will be paid in full.
Thus, impairment of this class results from a
deferral of payments to the class of up to 24
months.

### B. *The Absolute Priority Rule and the New Value Exception*

LW takes the position that even if the
Debtor can pass the classification test and
satisfy the provisions of section 1129(a)(10), it
cannot pass the fair and equitable test for
cramdown under 11 U.S.C. § 1129(b). This
section provides, in part, that a plan is not
fair and equitable with respect to an im-
paired dissenting class if the holder of a
junior claim or interest receives or retains
any property on account of such claim or
interest. 11 U.S.C. § 1129(b)(2)(B)(ii). In
this case, the Debtor's plan provides that the
partners will inject up to $300,000.00 of cash
into the Debtor upon confirmation. This
cash will be used to fund the payment of
unsecured claims of creditors other than the
unsecured claim of LW. In addition, a
$1,500,000.00 note secured by unencumbered
property of Krisch Hotels, Inc., its general
partner, will be provided as part of the pay-
ment on the LW undersecured debt. *See*
sections 4.09, 4.10, and 4.11 of the Debtor's
plan. In exchange for the new value provid-
ed by the partners, the partners will retain
their interests in the reorganized Debtor.

The plan provides that the LW unsecured
recourse claim will be pegged at $3,710,-
043.00 as of the effective date of the plan.
*See* section 4.10 of the Debtor's plan. Exhib-
it DS–5 to the Debtor's disclosure statement
shows that Debtor estimates this will pay
approximately 26% of the unsecured claim of
LW.

The Fourth Circuit in the *Bryson* case,
*supra,* discussed the absolute priority rule
and the new capital exception to it even
though a decision on that issue in *Bryson*
was not necessary because the *Bryson* plan
failed on the classification issue. In *Bryson,*
the Fourth Circuit identified the issue in
terms of the "plain words of the statute:"

Under section 4.10 of the plan, as amended,
LW's unsecured recourse claim will be deter-
mined and then paid by the issuance of a new
value note (payable two years after the effective
date in cash or by deed in lieu of foreclosure of
the Six Hotels), cash on hand, offset of claim
against LW, offset of cash collateral payments,
and offset of voidable preference claims. The
Debtor estimates a 26% payout.

The question is whether the equity holders receive anything 'on account of' their prior interest.

*Bryson* at 504.

The *Bryson* court concluded as follows: This exclusive right to contribute (new equity) constitutes 'property' under section 1129(b)(2)(B)(ii), which was received or retained on account of a prior interest.

*Id.*

In between the two statements quoted above, the *Bryson* court noted that the Debtor has an exclusive right to propose a reorganization plan for 120 days, and that the *Bryson* plan provided that equity holders could not only retain the exclusive right to contribute new capital but could also retain the right to return of their new capital prior to the payment of Traveler's unsecured claim.

LW argues that the *Bryson* court's statement quoted above eliminates any possibility for an exception to the absolute priority rule. In support of this position, LW points to the fact that the Fourth Circuit did not analyze the *Bryson* plan for new value in light of the elements developed by existing case law for determining whether or not a new value exception to the absolute priority rule is warranted. *See Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). This Court interprets the *Bryson* opinion differently. The *Bryson* court holds only that the **exclusive right** of existing equity to contribute new capital runs afoul of section 1129(b)(2)(B)(ii).

The *Bryson* court concluded its opinion by focusing on the fact that Travelers was the only creditor who would not be paid in full under the plan and stated:

Only Travelers is truly impaired. This combination of factors leads us to conclude that **even if some limited new capital exception were viable under the Bankruptcy Code** it would not be so expansive as to apply under the facts of this case. A plan must be fair and equitable in a broad sense, as well as in the particular manner

specified in 11 U.S.C. § 1129(b)(2). Here the debtors have carried their opportunity for self dealing too far.

*Bryson,* at 505 (emphasis added).

Because of this language, it appears that the Fourth Circuit left the door open for consideration of some "limited new capital exception." The only prohibition in the Fourth Circuit at this point is that the Debtor may not propose a plan which gives old equity the exclusive right to contribute new capital and retain their old equity positions as a result of the contribution.

The Debtor's plan proposes to do what the Fourth Circuit forbids. However, this flaw in the Debtor's plan does not mean that the Debtor is incapable of proposing a plan which is a candidate for confirmation.[11] The Debtor should be given some reasonable period of time to determine if a revised plan can be developed which meets the criteria for confirmation under section 1129(b) as interpreted by the Fourth Circuit in *Bryson.*

Although the exclusivity period provided by 11 U.S.C. § 1121 has expired, the Court is aware that this case has been pending for only eight and one-half months and is a very large Chapter 11 for the Western District of Virginia. Also, it is clear that LW is already undersecured by at least $3,000,000. The purpose of Chapter 11 is to provide a debtor an opportunity to rehabilitate. Thus, in the interests of giving the Debtor every opportunity to reorganize within a reasonable period of time, it is

### ORDERED:

That the automatic stay of 11 U.S.C. § 362 shall remain in full force and effect conditioned upon the filing by Debtor of an amended plan within thirty (30) days from the date of the docketing of this Decision and Order.

---

11. As a step-down position, LW advocates that the Court find a limited new value exception based upon a bidding process open to all parties in interest. *See, In re Bjolmes Realty Trust,* 134

B.R. 1000 (Bankr.D.Mass.1991). At this stage of the proceeding, confining the *Bryson* decision in this manner is premature.