**In re Robert R. DeLUCA, Marilyn S. DeLuca, Debtors.**

**PRINCIPAL MUTUAL LIFE INSURANCE COMPANY, Movant,**

v.

**LAKESIDE ASSOCIATES, L.P., Respondent.**

**Bankruptcy No. 95–11924–AM. Contested Matter No. 96–1211.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

April 1, 1996.

---

1. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

798

Kevin M. O'Donnell, McKinley, Schmidtlein, O'Donnell & Bornmann, P.L.C., Alexandria, VA, for debtor in possession.

Lawrence H. Fischer, Charles A. Moster, Deckelbaum Ogens & Fischer, Chtd., Washington, DC, for Principal Mutual Life Insurance Company.

Linda Lemmon Najjoum, Hunton & Williams, McLean, VA, for Crestar Bank.

## MEMORANDUM OPINION

STEPHEN S. MITCHELL, Bankruptcy Judge.

A hearing was held on March 25, 1996, on the motion filed by Principal Mutual Life Insurance Company ("Principal Mutual") on February 13, 1996, for relief from the automatic stay in the case of Lakeside Associates, L.P. ("Lakeside" or "the debtor") in order to foreclose under a deed of trust or, in the alternative, for dismissal of the case. At the conclusion of the hearing the court made findings of fact and conclusions of law orally on the record and ruled that relief from the stay would be granted. The purpose of this memorandum opinion is to explicate more fully the basis for the court's ruling and to modify in certain respects the conclusions of law stated orally on the record, although the modifications do not change the court's ruling.

### Facts and Procedural Background

The debtor, Lakeside Associates, L.P., is a Virginia limited partnership whose sole asset consists of a 60,000 square foot office building known as the Lakeside Building, located in the Countryside Shopping Center complex, in Sterling, Loudoun County, Virginia. The general partners are Robert and Marilyn

DeLuca ("the DeLucas"), who are now also the only limited partners.[1] Principal Mutual holds a first deed of trust and assignment of rents to secure a loan made on February 17, 1989, in the amount of $7,000,000. The loan matured in February, 1994, at which time the debtor was unable to obtain refinancing or to pay the loan off. In July, 1994, Principal Mutual revoked the debtor's license to collect rents and instructed the tenants to pay their rent directly to Principal Mutual. Since that date Principal Mutual has collected all or essentially all of the rents and has directly paid the operating expenses, although it declined to pay a number of expenses that the debtor requested be paid, including the Loudoun Country business and professional license tax imposed on business landlords and the management fees and some of the direct labor costs of American Property Services, Inc. ("APS"),[2] the property manager. The DeLucas, whose real estate portfolio included numerous distressed projects, filed a chapter 11 petition for themselves in this court on May 5, 1995. Within a short period before and after that date, they also caused chapter 11 petitions to be filed in this court by thirteen of the real estate partnerships or limited liability companies they owned or controlled ("the DeLuca entities"), including Lakeside, whose petition was filed on May 16, 1995.[3]

Lakeside remains, at least technically, in possession of its estate as debtor in possession, although Principal Mutual has continued since the filing date to collect the rents and to directly pay the operating expenses. The debtor has proposed, with several variations, what is styled a "joint" plan of reorganization with the DeLucas and nine of the other DeLuca entities.[4] The most recent version of this plan—entitled the Fifth Amended Joint Plan of Reorganization—was filed in open court on March 25, 1996, the day of the relief from stay hearing.[5]

For the purpose of relief from stay and confirmation, the debtor and Principal Mutual stipulated that the fair market value of the Lakeside Building was $6.9 million. The debtor further stipulated that Principal Mutual's allowed claim was at least in that amount, and that the debtor had no equity in the property.

### Conclusions of Law and Discussion

This court has jurisdiction over this controversy under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference entered by the United States District Court for the Eastern District of Virginia on August 15, 1984. This is a "core" proceeding under 28 U.S.C. § 157(b)(2)(G).

■ Under § 362(a), Bankruptcy Code, the filing of a bankruptcy petition creates an

---

1. When the debtor's chapter 11 petition was filed, Joel T. Broyhill owned a 12% limited partnership interest in the debtor. As a result of a post-petition settlement of various controversies between the DeLucas and Broyhill, Broyhill has transferred his interest to the DeLucas.

2. APS is wholly owned by the DeLucas.

3. An order for joint administration of the DeLucas' case with the cases of the DeLuca entities was entered early in the proceedings before it became apparent that each of the DeLuca entities was separate and distinct in terms of debt structure and assets. While a chapter 11 trustee has been appointed for ten of the DeLuca entities (not including Lakeside), the DeLucas themselves remain in possession of their estate.

4. Although entitled a "joint" plan, separate disclosure statements have been prepared in each case and separate confirmation hearings scheduled. So far, the plan has been confirmed in one of the DeLuca entity cases (Baronwood Associates Limited Partnership) and withdrawn in five others.

5. The relief from stay hearing was scheduled, at Principal Mutual's request, to be heard together with the hearing on confirmation of the debtor's Third Amended Joint Plan of Reorganization. After approval of the disclosure statement, the debtor filed a Fourth Amended Joint Plan of Reorganization which, while it effected some modification of the treatment of claims and interests in one of the companion cases (Colonial Associates, L.P.), made no change with respect to Lakeside. The Fifth Amended Joint Plan of Reorganization, filed the morning of the confirmation hearing, however, effected a very substantial change in the proposed treatment of claims and interests in the Lakeside case. Accordingly, the court ruled that preparation and approval of a new disclosure statement would be required. A confirmation hearing was therefore not held. Principal Mutual, however, elected to go forward on the relief from stay.

automatic stay of, among other actions, "any act to ... enforce any lien against property of the estate." Under § 362(d), the court, "on request of a party in interest and after notice and a hearing," may grant relief from the stay

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property ..., if—

(A) the debtor does not have equity in such property; and

(B) such property is not necessary to an effective reorganization.

An "effective" reorganization requires "a reasonable possibility of a successful reorganization within a reasonable time." *United Savings Assn. v. Timbers of Inwood Forest Assocs. Ltd.,* 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988). *See, Sun Valley Newspapers, Inc. v. Sun World Corp. (In re Sun Valley Newspapers, Inc.),* 171 B.R. 71 (9th Cir. BAP 1994) (relief from stay properly granted where debtor unable to propose a confirmable plan). The party seeking relief from the stay has the burden of proof on lack of equity; the debtor has the burden of proof on all other issues, including whether the property is necessary to an effective reorganization. § 362(g), Bankruptcy Code.

Since the debtor concedes it has no equity in the Lakeside Building, the issue resolves to whether the property is necessary to an effective reorganization. Certainly, since the building is the debtor's sole asset, there is no apparent way the debtor could reorganize without the property. Accordingly, the property is clearly necessary to a reorganization. The question remains, however, whether *any* reorganization is possible within a reasonable period of time under the facts of this case.

 To answer this question, the court is required to inquire into the potential con-

firmability of the debtor's proposed plan or any likely amendment to it. Principal Mutual asserts that neither the Fourth nor the Fifth Amended Joint Plan of Reorganization can be confirmed because the debtor, as an objective matter, cannot obtain the acceptance of a non-insider impaired accepting class. The debtor rejoins that the only reason it is unable to obtain such acceptance is that Principal Mutual has bought up a sufficient number of the unsecured claims to block acceptance by the class of unsecured creditors. The debtor, accordingly, has moved the court under § 1126(e), Bankruptcy Code, to designate the rejecting votes of the claims purchased by Principal Mutual as not having been cast in good faith. Alternatively, the debtor contends that Principal Mutual is an "insider," and that for that reason the claims held by it must be disregarded in determining whether there is an impaired accepting class. Under either theory, if the unsecured claims voted by Principal Mutual are not counted, the debtor has sufficient accepting votes from among the class of general unsecured creditors so as to have the acceptance of that class, thereby positioning the debtor to seek confirmation of the plan under the "cramdown" provisions of § 1129(b). Finally, the debtor contends that even if the unsecured claims voted by Principal Mutual *are* counted, the plan's acceptance by the priority tax claim class constitutes the required acceptance by a non-insider impaired class. Principal Mutual responds by asserting that the proposed treatment of the priority tax claim class constitutes "artificial" impairment.

### A. The debtor's proposed plan

The Fourth Amended Joint Plan of Reorganization,[6] which until the morning of the hearing was the plan before the court, provided the following treatment of claims and interests:

---

**6.** With respect to the Fourth amended plan and its predecessors, the adjective "joint" is largely a misnomer. Although the DeLucas rely in their individual case on the expected distributions of cash flow from the reorganized DeLuca entities, the original "joint" plan nevertheless consisted essentially of eleven different plans (that of the DeLucas and ten of the DeLuca entities) in a single document. With respect to Lakeside, however, there was one "joint" feature in that Crestar Bank, a creditor in the individual case and in several of the other DeLuca entity cases, was being given a subordinate lien on the Lakeside Building to secure its claim even though it is not a creditor in the Lakeside case.

Class 1—Administrative Claims. These are to be paid from "funds first available" at or after confirmation.

Class 2—Priority Claims. The sole claim in this class is a $2,200 claim by Loudoun County for business license tax. The claims in this class are to be paid in full, with interest at 7%, either at confirmation, "to the extent funds are available," or, in any event, within 5 years of confirmation. This class has voted to accept the plan.

Class 3—Secured Claim of Principal Mutual. Principal Mutual would retain its lien, but the debtor's license to collect rents would be restored. All arrearages and accumulated interest existing as of 30 days after confirmation would be capitalized and added to the outstanding principal. The resulting new principal balance would be paid in monthly installments beginning 60 days after confirmation, with interest calculated at 8% and amortized over 30 years, but with the entire balance due and payable in seven years. This class is impaired, and Principal Mutual has voted to reject it.

Class 4—Tenant security deposits. This class would be paid in full in the ordinary course of business and is not impaired.

Class 5—General unsecured creditors. This class, which consists of approximately $27,778 in unpaid vendor and utility bills, is to be paid in full from cash flow following payment of operating expenses, administrative claims, debt service on the Principal Mutual claim, and the priority tax claim. The plan provides no payment schedule, but the disclosure statement estimates the claims will be paid within 12 months. This class is impaired. If the votes of four claims totalling $17,003 purchased by Principal Mutual are counted, this class has rejected the plan.

Class 6—"Related Party" unsecured claims. No distribution will be made on account of such claims, and the claims will be treated as a contribution to capital and the claimant's capital account adjusted accordingly.

Class 7—Equity interest holders. These consist of the general and limited partners. The partners will retain their partnership interests and will be entitled to distributions of available cash flow after operating expenses, debt service, and other claims are paid.

In addition, Crestar Bank, which is not a creditor in Lakeside, but is classified as a Class 3(b) creditor in the companion case of Countryside Commercial and Professional Center, L.P., would have its existing lien in that case "extended" as a second deed of trust against the Lakeside Building.

The Fifth Amended Joint Plan of Reorganization, filed the morning of the relief from stay hearing, makes one minor and one major change. The minor change involves Class 2 and the deletion of the language referring to payment, "to the extent funds are available," at confirmation, so that the plan now simply provides for payment within five years of confirmation. The major change affects the treatment of Principal Mutual's secured claim. Principal Mutual also holds a first deed of trust against a neighboring parcel of real estate owned by one of the other DeLuca entities, Countryside Commercial and Professional Center, L.P. Under the new plan, the amounts due on the Lakeside note and the amounts due on the Countryside Commercial note, including all arrearages and accrued interest as of thirty days after confirmation, would be combined into a single obligation, to be repaid in monthly installments beginning 60 days after confirmation. Payments would be amortized over thirty years at an interest rate "to be determined by the court," with the obligation to be paid in full at the end of seven years. The existing deeds of trust against the Lakeside and Countryside Commercial properties would be modified "to provide for cross-collateralization of the re-stated and combined loan balance."[7] The DeLucas would make a

---

7. Considerable argument was presented at the hearing as to whether the Fifth amended plan, if confirmed, would result in the substantive consolidation of the Lakeside and Countryside Commercial cases. Although the plan provides for the combining of what are now separate notes into a single recapitalized obligation, as well as for the cross-collateralization of that obligation by the Lakeside and Countryside Commercial properties and for the granting of a second deed

"new value" contribution of $150,000 to the two partnerships, to be used for administrative expenses and tenant fit-out.

### B. *Whether Principal Mutual is an "insider"*

■ One of the requirements for confirmation, even in a "cramdown" under § 1129(b), Bankruptcy Code, is that

If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, *determined without including any acceptance of the plan by any insider.*

§ 1129(a)(10) (emphasis added). The debtor asserts that Principal Mutual, because of its actual control over the affairs of the debtor via its collection of the rents, is an "insider" and that its rejecting votes therefore cannot be counted in determining whether the debtor has obtained the acceptance of at least one impaired class. This argument, however, runs aground on the plain language of the statute, which in literal terms requires the court to disregard only an *"acceptance"* by an insider. The unsecured claims voted by Principal Mutual have rejected, not accepted, the plan. Therefore, even if Principal Mutual were an insider, § 1129(a)(10), Bankruptcy Code, does not require that its rejecting votes be disregarded.

■ But even if by some stretch of statutory construction the term "acceptance" were somehow construed as simply meaning "vote"—whether in favor of or against the plan—the evidence (both in the record and proffered) simply does not establish that Principal Mutual is an insider of the debtor. With respect to a debtor that is a partnership, § 101(31)(C), Bankruptcy Code, defines "insider" to include

(i) general partner in the debtor;

(ii) relative of a general partner in, general partner of, or person in control of the debtor;

(iii) partnership in which the debtor is a general partner;

(iv) general partner of the debtor; or

(v) *person in control of the debtor* [.]

(emphasis added). In order to qualify under the rubric of being "in control of the debtor", the alleged insider "must exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *Butler v. David Shaw, Inc.,* 72 F.3d 437, 443 (4th Cir.1996). The debtor points to the fact that Principal Mutual has been collecting all the rents and, since the debtor has no other source of income, effectively controlling which expenses are paid. The debtor has proffered testimony that Principal Mutual refused to pay a number of valid and necessary operating expenses and would not agree to the debtor entering into advantageous leases with a number of new tenants which would have required the use of Principal Mutual's cash collateral to construct the tenant improvements. As a practical matter, the debtor argues, Principal Mutual has a financial strangle-hold on the debtor and is therefore clearly a "person in control" of the debtor.

■ There is no question that Principal Mutual, whose loan matured pre-petition, has been collecting all the rents from the property under an assignment of rents that has not been challenged in this case. That, of course, does not prevent the debtor's partners from contributing additional cash to the debtor to be used to pay for tenant improvements or other capital expenses. APS has continued to perform the actual property management functions during the pendency of the chapter 11 case. If there was a dispute that essential operating expenses were not being paid, the debtor could have sought relief by bringing an appropriate motion before this court. No such motion was brought, and the debtor, although bringing a

---

of trust against the Lakeside Building as further security for Crestar Bank's claim in Countryside Commercial, it does not otherwise provide for the "consolidation" of the two estates. Each debtor remains liable only for its own unsecured claims, priority claims, and administrative expenses, and there is no provision for treating the future rents and operating expenses as though

the properties were owned by a single entity. In any event, for the purpose of confirmation, each case remains distinct. Specifically, the court, in determining whether in each case the debtor had obtained the required acceptances, would consider the votes only of the creditors in that particular case.

motion for use of cash collateral, ultimately never pressed it. In any event,

> In order for a creditor to "control" a debtor so as to be considered an "insider," the creditor must be so powerful that the debtor becomes a mere instrument or agent of the creditor, unable to make independent policy and personnel decisions. *The mere exercise by a lender of financial control* over a debtor *incident to the debtor-creditor relationship* does not make the lender an insider.

*LW–SP2, L.P. v. Krisch Realty Assocs., L.P. (In re Krisch Realty Assocs., L.P.),* 174 B.R. 914, 920 (Bankr.W.D.Va.1994) (emphasis added; internal citations omitted).[8] *See also, Practical Inv. Corp. v. Rellen (In re Practical Inv. Corp.),* 95 B.R. 935 (Bankr.E.D.Va. 1989); *Gray v. Giant Wholesale Corp.,* 758 F.2d 1000 (4th Cir.1985). Here, the only control exercised by Principal Mutual was financial control incident to the debtor-creditor relationship. That is simply insufficient to make Principal Mutual an "insider" of the debtor, and on that basis to disqualify its votes rejecting the debtor's plan.

C. *Whether the unsecured claims purchased by Principal Mutual were voted in bad faith*

 Even though Principal Mutual is not an "insider" of the debtor, there remains the question of whether its rejecting votes should be disregarded as not having been cast in good faith. As noted above, the debtor filed a motion under § 1126(e), Bankruptcy Code, to disqualify the unsecured claims voted by Principal Mutual.[9] Here, Principal Mutual candidly admits that it set out to purchase claims with the specific purpose of blocking acceptance of the debtor's plan. Principal Mutual's counsel contacted every unsecured creditor and offered to purchase the creditor's claim for 100 cents on the dollar. A number of the creditors declined to sell, but Principal Mutual was able to purchase more than one-third in dollar amount of the unsecured claims, sufficient to block acceptance by that class, since acceptance requires that at least two-thirds in dollar amount of the voting claims vote to accept the plan. § 1126(c), Bankruptcy Code.[10]

The potential for mischief from the buying up of claims in the chapter 11 context is obvious. As one court has vividly expressed it,

> Sanctioning claims acquisition for purposes of blocking an opponent's plan would … ignite a scramble for votes conducted almost entirely outside the [Bankruptcy] Code's carefully developed structure (plan, disclosure statement, equal treatment, regulated solicitation, court-supervised confirmation), leaving creditors to select not the best plan but the best they might be able to individually negotiate. Creditors would be paid, no doubt, but not equally, and not on the basis of accurate information. Such a wild free-for-all may appeal to the entrepreneurial capitalist, but it also issues a gilt-edged invitation to fraudulent and corrupt practices.

*In re Applegate Property, Ltd.,* 133 B.R. 827, 836 (Bankr.W.D.Tex.1991). In *Applegate,* the debtor and a creditor proposed competing plans. An insider of the debtor purchased a majority of the unsecured claims and sought to vote those claims in favor of the debtor's plan and against the creditor's plan. The court, although conceding that "[u]nder the proper circumstances, the purchasing of claims may well be a legitimate tactic," *Id.* at 836, n. 7, found under the facts

---

**8.** The issue of "insider" status arose in *Krisch* in the context of the debtor's attempt to separately classify a secured creditor's deficiency claim on the basis that, as an "insider" claim, it could properly be placed in a different class than general unsecured creditors.

**9.** "On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title."

**10.** "A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan."

before it that the insider's purchase of a blocking interest "was an obstructionist tactic done in contemplation of gaining an unfair advantage over other creditors," *Id.* at 835, and on that basis the court disqualified the rejecting votes. Although in *Applegate* it was the debtor's purchase of claims that was in issue, courts have reached the same result in the context of claims purchases by other parties. *See, In re Allegheny Int'l, Inc.,* 118 B.R. 282 (Bankr.W.D.Pa.1990) (non-creditor with designs to take over company acquired claims, proposed plan, and then acquired more claims to block confirmation of debtor's plan).

The Fourth Circuit, in construing § 1126(e), has explained,

> When a plan of reorganization is submitted to the creditors of a bankrupt for approval or disapproval, votes that are not cast in "good faith" are not to be counted.... It is well settled, however, that good faith in casting a vote does not require of the creditor a selfless disinterest. Each creditor is expected to cast his vote in accordance with his perception of his own self-interest, but he may not act with an ulterior or coercive purpose.

*Insinger Machine Co. v. Federal Support Co. (In re Federal Support Company),* 859 F.2d 17, 19 (4th Cir.1988). Examples of bad faith include votes cast "with a purpose of coercing payment ... of more ... than [the creditor] might reasonably perceive as his fair share of the debtor's estate," *Id.,* and votes cast out of "pure malice, ... blackmail ... [or] to destroy an enterprise in order to advance the interests of a competing business." *Id.* In *Federal Support Co.,* the bankruptcy court had held that the votes of three creditors voting against the plan had not been cast in good faith. The three creditors had joined in filing the involuntary petition that brought the debtor into bankruptcy court in the first instance and one of the creditors was the target of an antitrust suit brought by the debtor. The Fourth Circuit held that all three of the rejecting votes should have been counted. With respect specifically to the creditor (Insinger) that was the defendant in the antitrust action brought by the debtor, the court observed,

> ... Insinger must have thought that disapproval of the plan of reorganization coincided with its self-interest.... One's self-interest, however, does not provide an ulterior motive. Insinger was entitled to cast its vote in accordance with its perception of its self-interest, and nothing suggests that Insinger was motivated by any other interest or purpose.

*Id.* at 20.

To be sure, *Federal Support Co.* involved creditors voting their own claims, not claims they had purchased to secure an advantage in the confirmation process. Here, however, Principal Mutual is by far the largest creditor and the one with the greatest financial stake in the reorganization. Its loan to the debtor matured pre-petition, but the debtor was unable to pay it. The debtor's proposed plan would make Principal Mutual an involuntary lender to the debtor for the next seven years. Principal Mutual obviously does not want to do so and obviously does not feel it to be in its financial self-interest to continue as the debtor's lender. There is not the slightest suggestion in the record or the proffers that Principal Mutual is motivated by malice, blackmail, or any design to further the interest of a competing enterprise—or indeed, any interest other than to be able to enforce its legitimate contractual rights with respect to a loan that has matured. Principal Mutual paid 100 cents on the dollar for the claims it purchased, and it extended the purchase offer to every unsecured creditor. The amount it paid is the same (100%) as the amount proposed by the debtor's Fourth and Fifth amended plans. While the concerns expressed in *Applegate* remain valid ones, the court finds that under the standard expressed in *Federal Support Co.,* no basis exists in this case to disqualify the unsecured claims purchased by Principal Mutual as having been voted in bad faith.

D. *Whether the priority tax claim class is impaired*

The debtor takes the position finally that even if Principal Mutual's rejecting votes are counted with respect to Class 5, there is one other non-insider impaired class that has accepted the plan, namely Class 2.

**806**

That class, as noted above, consists of a single $2,200 claim owed to Loudoun County, Virginia, for business license tax. The claim has been purchased by a friend of the DeLucas and has voted to accept the plan. Under the Fourth amended plan, now withdrawn, the claim was to be paid, together with 7% interest, either at confirmation (if funds were available), otherwise within five years. Under the Fifth amended plan, the provision for payment at confirmation was deleted, and the plan simply proposes payment with interest at 7% over a period not exceeding five years, although no particular payment schedule is specified.

Principal Mutual asserts, however, that any impairment of the Class 2 claim (by paying it over time rather than in full at confirmation) is artificial. See, *In re North Washington Center Ltd. Partnership,* 165 B.R. 805 (Bankr.D.Md.1994) (payment of trade creditors over time when debtor had funds to pay them in full at confirmation was artificial impairment); *In re Investors Florida Aggressive Growth Fund, Ltd.,* 168 B.R. 760 (Bankr.N.D.Fla.1994) (debtor had sufficient unencumbered funds to pay trade creditors immediately); *Windsor on the River Assocs., Ltd v. Balcor Real Estate Finance, Inc. (In re Windsor on the River Assocs., Ltd),* 7 F.3d 127 (8th Cir.1993) (By lowering payment to mortgagee, debtor could have paid unsecured creditors in full on confirmation date). Indeed, given the relatively insignificant amount of the claim and the fact that the Fifth amended plan provides for a "new value" contribution by the DeLucas of $150,-000.00,[11] it seems highly unlikely that the debtor would be able to demonstrate a valid business reason for paying the Class 2 claim over time rather than in full at confirmation.

However, the court need not reach the issue of artificial impairment, because in any event a class of priority tax claims cannot constitute an impaired accepting class. *Travelers Ins. Co. v. Bryson Properties,*

XVIII *(In re Bryson Properties, XVIII),* 961 F.2d 496, 501, n. 7 (4th Cir.1992). In *Bryson Properties,* the court noted that priority tax claims "are not designated as a 'class' within the definition of § 1123(a)"[12] and that other courts had held, on that basis, that "acceptance of a plan by priority tax claimants is not acceptance by a 'class' of impaired claims under § 1129(a)(10) for the purpose of cram down." *Id.* The court concluded,

We agree that priority tax claimants, which receive preferential treatment under the Code (see 11 U.S.C. § 1129(a)(9)(C)), are not an impaired class that can accept a plan and bind other truly impaired creditors to a cram down.

*Id. Bryson* is controlling, and the debtor therefore cannot rely on acceptance by the Class 2 claim as satisfying the requirement of § 1129(a)(10) for acceptance by a non-insider impaired class.

*Ruling*

This chapter 11 case has been pending for ten months and the debtor does not have a confirmable plan before the court. If the defect in the debtor's plan were remediable, the court would give the debtor a reasonable opportunity to amend its plan and would not grant immediate relief from the automatic stay. *See, In re Krisch Realty Assocs., L.P., supra* (although plan violated absolute priority rule, debtor was given 30 days to file amended plan where chapter 11 case had been pending for only eight and one-half months and the secured creditor was already substantially undersecured). But the defect here is one that goes to the very heart of the debtor's ability to achieve confirmation, namely the lack of sufficient votes (unless Principal Mutual were to change its mind) to obtain acceptance by a non-insider impaired class, which in turn is a prerequisite to confirmation. Since the debtor concedes that it has no equity in the Lakeside Building, and since the debtor is, as an objective matter,

11. The $150,000 is for both Lakeside and Countryside Commercial. The stated purpose for the cash infusion is "to fund payment of administrative expenses and to commence ... capital improvements necessary to new leases...."

12. "... a plan shall—(1) designate ... classes of claims, *other than claims of a kind specified in section* 507(a)(1), 507(a)(2), or *507(a)(7)* of this title, and classes of interests." (emphasis added). Section 507(a)(7) refers to the allowed unsecured claims of governmental units for certain pre-petition taxes.

unable to achieve confirmation over the rejection of Principal Mutual and the votes it controls, there is no "reasonable possibility of a successful reorganization within a reasonable time." *Timbers, supra.* Accordingly, the property is not necessary to an effective reorganization, and under § 362(d)(2), Principal Mutual is entitled to relief from the automatic stay in order to enforce its deed of trust.

A separate order will be entered consistent with this opinion.