**In re GRANDFATHER MOUNTAIN LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 95–50621C–11W.**

United States Bankruptcy Court, M.D. North Carolina, Winston–Salem Division.

Dec. 16, 1996.

478

Gene B. Tarr, Winston Salem, NC, for Debtor.

Thomas W. Waldrep, J., Winston Salem, NC, for Committee of Ltd. Partners.

Rory D. Whelehan, Winston Salem, NC, for Berkeley Federal Savings Bank.

## MEMORANDUM OPINION

WILLIAM L. STOCKS, Chief Judge.

This case came before the court on October 24, 1996, for a confirmation hearing on the Debtor's second amended plan ("the plan"). Gene B. Tarr appeared on behalf of

the Debtor. The plan is supported by the Committee of Limited Partners ("the Committee"). Thomas W. Waldrep, Jr. appeared on behalf of the Committee. The plan is opposed by Berkeley Federal Savings Bank ("Berkeley") who filed an objection to the plan and voted against the plan. Rory D. Whelehan appeared on behalf of Berkeley. Both the Debtor and Berkeley offered evidence at the confirmation hearing which included testimony of witnesses as well as numerous documentary exhibits. The court's findings of fact and conclusions of law pursuant to Bankruptcy Rules 9014 and 7052 are hereinafter set forth.

### JURISDICTION

The court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L) which this court may hear and determine.

### FACTS

1. The Debtor.

The Debtor is a North Carolina limited partnership formed to acquire, own and lease a Shopping Center in Boone, North Carolina, known as The New Market Center (the "Shopping Center"). The Debtor was formed in August of 1988. Seventy limited partners purchased 415 limited partner units at a price of $5,000.00 per unit for a total limited partner contribution of $2,075,000.00. The Debtor's general partners are Benton Investment Company and K.B. Boone, Inc., each of whom contributed $10,500.00 to the capital of the partnership. The Shopping Center is located in Boone, North Carolina, and consists of a total building area of 136,-000 square feet with on-site parking for 748 automobiles. The Debtor paid a purchase price of $8,852,000.00, which included the assumption of a $6,900,000.00 non-recourse

promissory note in favor of The Mutual Benefit Life Insurance Company ("MBL").[1] The Shopping Center was new when it was purchased by the Debtor in 1988. When the Debtor acquired the Shopping Center, the two largest tenants were Rose's Stores, Inc. ("Rose's") and Lowe's Food Stores, Inc. ("Lowe's"). Also available for leasing were 18 additional shop spaces. At the time of acquisition, Rose's occupied 54,000 square feet and paid $229,500.00 minimum annual base rent ($4.25 per square foot) plus a percentage rental equal to 1.5% of gross annual sales in excess of $11,475,000.00. The Rose's lease commenced in 1988 and had an original term of twenty (20) years (expiring on March 1, 2008), with renewal options for four successive five-year periods. Rose's also was obligated to make contributions to common area maintenance expenses on a pro-rata basis, not to exceed $13,500.00 per year, during the original term. At the time of acquisition, Lowe's occupied 31,759 square feet and paid $192,000.00 minimum annual base rent ($6.05 per square foot) and a percentage rental equal to 1.4% of gross annual sales in excess of $19,200,000.00. Lowe's original 20–year lease term expires on February 20, 2008 with options to renew the lease for four consecutive five-year periods. Lowe's is obligated to pay $.25 per square foot for common area maintenance for years one through five of the lease term, increasing by $.05 per square foot each five-year period thereafter.

2. The Filing of the Chapter 11 Case.

In April of 1993, Rose's filed for relief under Chapter 11. Rose's continued to pay the base rental required under its lease for approximately one year. However, in approximately April of 1994, Rose's notified the Debtor that it might close the store located in Debtor's Shopping Center or seek rent concessions in the magnitude of $100,000.00 per year for some three years, with descending reductions in later years. In approximately May of 1994, under circumstances which are in dispute between the Debtor and Rose's, Rose's implemented a reduction of $100,000.00 per year in its base rents to the

---

**1.** During the pendency of this case Berkeley acquired MBL's claim in this case and Berkeley is now the holder of the promissory note, deed of trust, assignment of rents and other loan documentation of the claim against the Debtor.

Debtor. Rose's began paying the reduced monthly rental to Debtor in approximately May of 1994, and Debtor was receiving reduced monthly rentals from Rose's when Debtor filed its own Chapter 11 case on June 29, 1995. Debtor filed as a result of MBL declaring a default with respect to its loan and notifying all tenants in the Shopping Center to make lease payments to MBL rather than to Debtor.

### 3. Creditors in this case.

The Debtor acknowledges that Berkeley has both a secured claim and an unsecured claim. In addition, the Debtor contends that there are two other unsecured creditors who are not insiders. According to the Debtor, Jean Winborne Boyles is a non-insider with an unsecured claim in the amount of $2,022.00. The Debtor also lists Rose's as a non-insider with an unsecured claim. According to the Debtor, Rose's has an unsecured contingent claim which has been estimated at $10,837.32 for voting purposes. Each of these parties has been classified separately under the plan. Ms. Boyles is the only creditor in Class 4 of the plan which is the class for general unsecured claims of unrelated parties. Rose's is the only creditor in Class 6 under the plan. Berkeley disputes the status and classification of both of these parties.

### 4. The Berkeley Claim.

On the petition date the Berkeley claim was in the amount of $7,126,665.00 and was secured by a deed of trust on the Shopping Center and an assignment of the rents from the Shopping Center. During the pendency of the case the Shopping Center was appraised at a value of $4,900,000.00 by an appraiser selected by MBL, Berkeley's predecessor. Although the Debtor also obtained an appraisal which was less than the Berkeley appraisal, the Debtor chose to use the amount of the Berkeley appraisal for purposes of the plan. Berkeley did not elect to have its claim treated as a fully secured claim pursuant to § 1111(b) of the Bankruptcy Code. The Debtor contends that Berkeley, therefore, has a secured claim in the amount of $4,900,000.00, with the balance of the claim

being an unsecured claim. During the pendency of this case Berkeley and its predecessor have received adequate protection payments totaling $564,968.00 through July 31, 1996. The Debtor projects that an additional $217,295.00 in adequate protection payments will be made through December 31, 1996, as a result of which the Debtor contends that the Berkeley unsecured claim is $1,444,402.00 for the purposes of the plan.

### 5. Treatment of Berkeley under the Plan.

Class 3 under the plan consists of the Berkeley secured claim. The plan calls for the Debtor to execute and deliver to Berkeley a new, non-recourse note in the principal amount of $4,900,000.00 and providing for interest at the fixed rate of 8.25%. The plan provides that the note is to be amortized over a 30 year period, with all principal and interest due and payable on the date which is five years after the effective date of the plan. Under the secured note to be issued to Berkeley, monthly payments of principal and interest commence on the first day of the month following the effective date and continue for a period of five years. The Debtor estimates that these monthly payments will be in the amount of $36,812.00 for the first 59 payments, with the last payment being a balloon payment for the unpaid balance of the note. Pursuant to the plan, Berkeley retains all of its prepetition liens.

The plan provides alternative treatment for the balance of the Berkeley claim. Unless Berkeley elects the alternative treatment, Berkeley retains an unsecured deficiency claim in the estimated amount of $1,444,402.00. Under this alternative, the plan provides for Berkeley to receive a cash payment of $160,000.00 on the first day of the month following the effective date, plus annual distributions equal to 30% of the net operating income of the Shopping Center during the five years of the plan. The Debtor projects that the aggregate payment to Berkeley as an unsecured creditor will range between a low of $186,440.00 to a high of approximately $552,371.00, i.e., a range from 12.9% to 38.24% of the claim. The plan provides that payment of the fifth annual payment to Berkeley constitutes payment in full of the

unsecured deficiency claim. However, if the Shopping Center is sold or refinanced before the fifth annual payment is made, the unsecured deficiency claim of Berkeley would be deemed to be satisfied in full and Berkeley would receive no further payments on its unsecured deficiency claim. Under this alternative, the new capital contribution from the Debtor's limited and general partners is $360,000.00 in order to provide $200,000.00 for upfit, marketing and operating capital, and $160,000.00 for the payment to Berkeley. Existing limited partners have the first right to preserve their interest in the Debtor by making their pro-rata share of the new capital contribution. Any remaining units may be purchased by limited partners not related to or affiliated with the general partners, on a pro rata basis. Thereafter, remaining units are required to be purchased by Debtor's general partners, in order to ensure that the new capital contribution required by the plan will be made. If the general partners fail to make the new capital contribution, the plan provides that the bankruptcy court retains jurisdiction to enter an order converting the case to a case under Chapter 7.

Under the alternative treatment offered under the plan, Berkeley may elect to participate in the reorganized Debtor as a limited partner, or as a limited partner and general partner, by "purchasing" such interests with the entire amount of its unsecured deficiency claim. The plan contains a schedule which specifies the method by which Berkeley "spends" the entire amount of its allowed unsecured deficiency claim to "purchase" a partnership interest, contributes its pro rata share of new capital, and obtains a 29.00% share of the new limited partner units. Under this alternative the limited partners' original contributions of $2,075,000.00 have been "adjusted" to a present value of $3,437,-164.00 by compounding them at an annual rate of 9.625% for the six years since the contributions were paid by the limited partners. Utilizing this figure and $1,444,402.00, the amount of Berkeley' unsecured deficiency claim, the plan allocates a 69% ownership interest to the limited partners, 29% to Berkeley and 2% to the general partners. Based on these allocations of ownership, Berkeley would be required to contribute 29.00% of the new capital or $58,000.00. The original limited partners would be required to contribute 69.00% of the new capital, or $138,000.00, and the general partners would contribute 2% of the new capital, or $4,000.00. Under this alternative, Berkeley is entitled to receive annual distributions equal to 29% of the net operating income and Berkeley also would be entitled to participate in any gain arising from the sale of the Center to the extent of its 29% interest. The amount of the payments from the net operating income to be received by BFBT as a limited partner is projected to range from a low $25,558.00 to a high of $379,292.00. In addition, gain arising from the sale of the Center could increase total distributions to BFBT significantly.

6. Berkeley's objection to the plan.

In its lengthy objection, Berkeley asserts that the plan fails to comply with both § 1129(a) and § 1129(b) of the Bankruptcy Code. The principal grounds for Berkeley's objection under § 1129(a) may be summarized as follows: (a) the plan does not comply with § 1129(a)(1) because it fails to meet the requirements of § 1122 and § 1123 of the Code; (b) the plan does not comply with the requirement § 1129(a)(3) that a plan be filed in good faith because it impermissibly classifies claims and attempts to gerrymander impaired accepting classes of claim, thereby evidencing a lack of good faith; (c) the plan fails to satisfy the requirements of § 1129(a)(10) because the plan has not been accepted by any legitimate impaired class of non-insiders; and (d) the plan does not satisfy the feasibility requirement of § 1129(a)(11) because it will likely be followed by the need for further liquidation or financial reorganization. Berkeley's objection under § 1129(b) raises three principal grounds for objection: (a) unfair discrimination in that the plan discriminates against Berkeley's unsecured claims; (b) the plan is not fair and equitable in that Berkeley does not receive the present value of its secured claim; and (c) the plan violates the absolute priority rule in that the Debtor's equity interest holders are retaining their interest in the Debtor while Berkeley's unsecured claim remains unpaid.

## ANALYSIS

### A. Objections Related to § 1129(a).

The objections by Berkeley under § 1129(a) of the Code are without merit and will be overruled. The principal objections by Berkeley under § 1129(a) relate to the classification of claims under the plan and the assertion that the plan does not satisfy the requirement in § 1129(a)(10) that the plan be accepted by at least one class of claims that is impaired under the plan, determined without including any acceptance of the plan by any insider. Berkeley argues that the Debtor manipulated the classification of claims and engaged in gerrymandering in order to satisfy the requirement of § 1129(a)(10) and obtain a confirmable plan. In making this argument, Berkeley points out that at most there are only three unsecured creditors in this case (Rose's,[2] Jean Winborne Boyles and Berkeley) and that the claims of each of these unsecured creditors were placed in separate classes consisting of only a single claim. According to Berkeley, this was done because Debtor knew that if the other two unsecured claims were placed in a class with Berkeley's unsecured claim, Berkeley would vote against the plan, "swamp" the class and prevent Debtor from satisfying the requirements of § 1129(a)(10) which, of course, would preclude confirmation of Debtor's plan.

The section of the Bankruptcy Code dealing with classification of claims is § 1122, which provides:

(a) except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.

(b) a plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

The explicit language of § 1122 requires substantial similarity between claims that are placed in the same class, but does not require that all substantially similar claims be placed within the same class. Section 1122 therefore leaves some flexibility in the classification of unsecured claims. These principles are not contested by the parties in this case. Instead, the contest between the parties in this case, as in most single asset Chapter 11 cases, has to do with the amount of flexibility which is permitted with respect to the classification of unsecured claims. In dealing with this issue, this court must be guided by the controlling authority embodied in *In re Bryson Properties, XVIII*, 961 F.2d 496 (4th Cir.1992), *cert. denied*, 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992), which deals with that issue. In *Bryson*, while acknowledging that § 1122 "grants some flexibility in classification of unsecured claims", the court pointed out that there is a limit to such flexibility. The court specifically stated that a debtor may not "gerrymander" or artificially impair classes of claims in order to obtain an impaired accepting class. *Id.* at 502. The court then held that where, as in the *Bryson* case, all unsecured claims received the same treatment in terms of plan distribution, separate classification on the basis of "natural" recourse claims and "unnatural" recourse claims arising under § 1111(b) is impermissible. At the same time, however, the court recognized that the determination of whether a classification unfairly discriminates requires consideration of the totality of the circumstances and that the existence of "natural" and "unnatural" recourse claimants is one factor to consider, but is not outcome-determinative. *Id.* at 505, n. 9.

This court does not read the *Bryson* case as holding that natural recourse claims and unnatural recourse claims arising under § 1111(b) can never be classified separately. The court found in *Bryson* that where separate classes are created but each class receives the same treatment, the classification will be regarded as done for the purpose of manipulating voting. This is not the situation in the case now before the court. In the present case, while the unsecured claims are

---

2. Berkeley has objected to the Rose's claim on various grounds and contends that Rose's has no claim and is not a creditor in this case.

classified separately, the treatment for the claims is different. Moreover, in the opinion of the court, the separate classification and different treatment for the unsecured claim of Berkeley is warranted by a significant, legally distinguishing difference between the Berkeley claim and the other unsecured claims in the case. Berkeley's unsecured deficiency claim arises out of a promissory note which creates a non-recourse obligation. The Berkeley claim is converted into a recourse claim only for purposes of this Chapter 11 case through the provisions of § 1111(b)(1)(A). On the other hand, the Rose's and Boyles claims arise from prepetition obligations incurred by the Debtor which are enforceable against the assets of the Debtor and against the general partners. *See* N.C.Gen.Stat. § 59–403 ("a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to persons other than the partnership and the other partners"). "The distinction between natural and unnatural recourse claims lies in the priorities retained by each of the claims notwithstanding their status as recourse claims in Chapter 11. Because LW's debt is non-recourse, it cannot collect from the general partners of the Debtor. Conversely, all of the other unsecured creditors ... have a right to recourse." *In re Krisch Realty Associates,* 174 B.R. 914, 918 (Bankr.W.D.Va.1994).

■ Under § 1129(a)(7)(A), every creditor in a Chapter 11 case is entitled to insist upon receiving as much in Chapter 11 as would be received in Chapter 7. Section 723(a) gives the Chapter 7 trustee a claim against each general partner of a partnership debtor for the full amount needed to pay any unsecured, but not non-recourse unsecured, claims which the estate otherwise is unable to pay. *See In re Overland Park Merchandise Mart,* 167 B.R. 647, 651 (Bankr.D.Kan. 1994). Therefore, in the present case, Rose's and Ms. Boyles, as holders of "natural" recourse claims, are entitled to insist that they receive under the plan as much as they would receive in Chapter 7 which, in the present case, would be 100% since it is undisputed that the general partners are solvent. This dissimilarity between the Berkeley unsecured claim and the claims of the other unsecured creditors permits the Debtor to classify the Berkeley claim separately in the present case and to provide different, less favorable treatment for the Berkeley claim than is provided for the separately classified unsecured claims who have the right to insist upon treatment more favorable than Berkeley may require. *See In re HRC Joint Venture,* 187 B.R. 202, 215 (Bankr.S.D.Ohio 1995); *In re Krisch Realty Associates, supra* at 918; *In re Overland Park Merchandise Mart, supra* at 650–51; *In re SM 104 Ltd.,* 160 B.R. 202, 220–21 (Bankr.S.D.Fla.1993); *In re Creekside Landing Ltd.,* 140 B.R. 713, 715 (Bankr.M.D.Tenn.1992). An additional reason for placing an unsecured deficiency claim created by § 1111(b) in a separate class is found within the language of § 1111(b) itself. In that regard, pursuant to § 1111(b)(1)(B) the election under § 1111(b) is to be made by "the class of which such claim is a part" and not by the individual § 1111(b) claimant. If the § 1111(b) claim is placed in the same class as general unsecured claims, the literal language of § 1111(b) would afford the general unsecured creditors the opportunity to vote on whether their classmate, the § 1111(b) claim holder, should be permitted to make the § 1111(b)(2) election. In such circumstances, the general unsecured creditors in the class could block the § 1111(b)(2) election by denying the § 1111(b) creditor the approval of the election by a majority in number of claim holders in the class required by § 1111. As pointed out in *In re SM 104 Ltd., supra* at 220, this is a result which could not have been intended by the drafters of the Bankruptcy Code.

■ In summary, the court concludes that the classification of unsecured claims under Debtor's plan in this case is a reasonable classification which should be permitted under the facts of the present case. Thus, it is permissible to have the Rose's claim, the Boyles claim and the Berkeley claim in separate classes. Whether the plan unfairly discriminates against Berkeley or is unfair and inequitable in its treatment of the Berkeley claim is a matter which the court will address in the portion of this opinion dealing with § 1129(b). *See In re Aztec Co.,* 107 B.R. 585, 592 (Bankr.M.D.Tenn.1989) ("[t]hat there is a

basis for separate classification does not pre-determine whether the proposed treatment of the separate classes under the plan is fair discrimination for purposes of § 1129(b)(I).").

However, for purposes of applying § 1129(a) and determining whether there is an impaired class accepting the plan, classification of the Boyles and Rose's claims into separate classes from the Berkeley claim is accepted. Since both of these creditors receive deferred payments under the plan, their legal rights are altered. Therefore, both Class 4, consisting of the Boyles claim, and Class 6, consisting of the Rose's claim, are impaired under § 1124. Both classes voted in favor of the plan. Leaving aside the Rose's claim which has been objected to by Berkeley,[3] the court concludes that Class 4, consisting of the Boyles claim, satisfies the requirement of § 1129(a)(10) that the plan must be accepted by at least one class of claims that is impaired under the plan, determined without including any acceptance of the plan by any insider. In doing so, the court rejects Berkeley's argument that Ms. Boyles is an insider whose acceptance may not be considered for purposes of § 1129(a)(10). The basis for Berkeley's argument is that Ms. Boyles "is an attorney who represented the Debtor pre-petition and, as such, is privy to the confidential information and affairs of the Debtor that would take her outside the realm of the traditional arms-length creditor and into the world of the 'insider'." (Berkeley Objection, p. 32). Ms. Boyles admittedly does not fall within the statutory definition of "insider" set forth in § 101(31) of the Code. Further, even though § 101(31) uses the word "includes" and therefore is not all inclusive, the court is satisfied from the evidence that at no time during this case did Ms. Boyles have the type of relationship with the Debtor which would make her an "insider" within the meaning of § 101(31) or § 1129(a)(10). While Ms. Boyles did act as attorney for the Debtor, all such services were rendered and completed months before the Chapter 11 case was filed. The services were rendered regarding a single isolated matter, namely, Debtor's claim in the Rose's

Chapter 11 case. There was no showing of any continuing representation after the services were completed and no showing that Ms. Boyles was ever consulted about or exercised any influence or control over the internal affairs of the Debtor. The simple fact that Ms. Boyles at one time handled an isolated legal matter for the Debtor and thereafter remained under a duty of confidentiality falls far short of making Ms. Boyles an insider in this case. The cases cited by Berkeley involve ongoing representation by attorneys or, at least, an ongoing and continuing relationship giving rise to continuing influence over the client. These cases are readily distinguishable from the present case in which there is no continuing representation or ongoing relationship and no continuing influence by the attorney.

 Berkeley also argues that Debtor's plan fails to satisfy the feasibility requirement of § 1129(a)(11). This argument, too, is rejected. The burden is upon the proponent of a plan to establish feasibility. In order to do so, a proponent must show that its plan has a reasonable prospect of success and is workable. The test of whether the Debtor can accomplish what the plan proposes is a practical one and, although more is required than mere hopes and desires, success need not be certain or guaranteed. See *Clarkson v. Cooke Sales and Service Co.*, 767 F.2d 417, 420 (8th Cir.1985); *In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. 324, 331 (Bankr. S.D.Ohio 1992); *In re E.I. Parks No. 1*, 122 B.R. 549, 558 (Bankr.W.D.Ark.1990). Where a plan provides for deferred payments over a period of time, a showing of feasibility requires the proponent to establish two components. First, the projections of future expenses and earnings must be derived from realistic and reasonable assumptions which are not merely speculative. See *In re Monnier Brothers*, 755 F.2d 1336, 1341 (8th Cir. 1985). Secondly, the ability to make the payments proposed must be demonstrated, based upon the projections. The Debtor sat-

---

**3.** Since the requirements of § 1129(a)(10) are satisfied through the acceptance of the plan by Ms. Boyles, it is not necessary for the court to

deal with Berkeley's objection to the Rose's claim.

isfied both of these components in the present case.

The financial projections relied upon by the Debtor are based on actual historical operations involving the actual expenses incurred by the Debtor in the operation of the Shopping Center over a period of five years. The income figures used in the projections represent rents actually being received under leases or from the projected leasing of some currently vacant space which it is reasonable to assume will be leased. The Debtor's rent projections include variables ranging from Rose's leaving its space and the space being vacant for the entire period of the plan to Rose's remaining in its space for the entire plan period at the original rental provided in the Rose's lease. The various scenarios contained in the Debtor's projections all show the Debtor as being able to carry out the provisions of the plan.

The evidence regarding Debtor's performance prior to the filing of this case also supports a finding of feasibility. Prior to August of 1994, the Debtor had not missed any payments to its mortgagee or to any non-insider creditor. Although Debtor did not make projected dividend payments to its limited partners, payments to creditors were made in a timely manner. In fact, when this case was filed, the Debtor had cash on hand in excess of $200,000.00. Debtor has remained current on its obligations since the filing of the petition in this case. With the exception of a delay in paying some property taxes in 1996 which resulted from a miscommunication with or by the former mortgagee, MBL, Debtor has always paid its property taxes in a timely manner.

It also is appropriate for the court to consider the adequacy of the capital structure of the Debtor. In that regard, the evidence offered at the hearing, including the projections submitted by the Debtor, reflect that sufficient cash balances should exist throughout the life of the plan, even though the projections include a worst-case scenario. Regarding the income of the Debtor which is utilized in the projections, the income figures are based on the actual rent rolls except to the extent that variations are proposed regarding Rose's and reasonable assumptions are made regarding the ability of the Debtor to rent a small amount of space which is currently vacant. In short, Debtor's evidence, taken as a whole, established that it is reasonably likely that the Debtor will be able to make the payments provided for under the plan without the need for further financial reorganization.

The court has considered the remaining arguments contained in Berkeley's objection related to § 1129(a), including the arguments that the plan does not comply with § 1122 and § 1123 and was not filed in good faith. This court also rejects these arguments and concludes that the plan in this case complies with all of the requirements of § 1129(a) except for the requirement of § 1129(a)(8), compliance with which is prevented by Berkeley's rejection of the plan. This leads to the question of whether the court should confirm the plan over the objection of Berkeley pursuant to § 1129(b).

**B. Requirements for cram down under § 1129(b).**

■ In order for a Chapter 11 plan to be confirmed without the acceptance of an impaired class, the plan must meet the requirements of 11 U.S.C. § 1129(b)(1). This provision requires that before a plan can be "crammed down" the plan must not discriminate unfairly and must be fair and equitable with respect to each class of claims that is impaired under the plan and has not accepted the plan. Section 1129(b)(2) sets forth specific standards which must be met in order for a plan to be "fair and equitable." However, the requirements of § 1129(b)(2) are not exclusive. Indeed, the requirements of § 1129(b)(2) are minimal standards only and a plan still may not be "fair and equitable" and, thus be unconfirmable, even though it meets the minimal standards of § 1129(b)(2). *Matter of D & F Construction Inc.*, 865 F.2d 673, 675 (5th Cir.1989); *In re IPC Atlanta Ltd. Partnership*, 142 B.R. 547, 555 (Bankr.N.D.Ga.1992); *In re Montgomery Court Apartments*, 141 B.R. 324, 356 (Bankr. S.D.Ohio 1992); *In re EFH Grove Tower Associates*, 105 B.R. 310, 313 (Bankr. E.D.N.C.1989).

In order to satisfy the overall requirement of § 1129(b)(1) that a plan be "fair and equitable", the plan must literally be fair and equitable. *In re EFH Grove Tower Associates, supra* at 313. The determination of whether a plan is fair and equitable must be made on a case-by-case basis and depends upon the specific facts and circumstances of each case. A proponent seeking confirmation of a plan on a nonconsensual basis must carry the burden of showing that the terms of the plan treat the dissenting classes fairly and do not unduly shift the risk of reorganization. That determination may include an analysis of some of the following factors as they are relevant to the dissenting class: (1) whether the statutory requirements of § 1129(b)(2) have been met; (2) whether, for a secured class, the valuation process has been fair; (3) whether the primary risk of reorganization remains with the equity interests of the reorganized debtor; (4) whether any secured loan restructure, including default provisions and other covenants, is reasonable when compared to the previous dealings of the parties; (5) whether the length of time for proposed repayment is reasonable; (6) whether, for an unsecured class, the percentage or formula for proposed payment demonstrates a good faith effort to repay those obligations; and (7) whether other particular inequities are inherent in the plan, including special prejudice to a dissenting class arising from its particular circumstances. *In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. 324, 346 (Bankr.S.D.Ohio 1992).

C. Whether the plan is fair and equitable as to Berkeley's secured claim.

In contending that the plan treatment for Berkeley's secured claim is fair and equitable in the present case, the Debtor argues that the plan satisfies the requirements of § 1129(b)(2)(A)(i). There are three requirements under this provision: (1) the plan must provide that the holder of the secured claim retain the lien securing such claim; (2) the plan must provide for the holder of such claim to receive cash payments which total at least the allowed amount of the secured claim; and (3) such cash payments must have a present value as of the effective date of the plan equal to the value of the collateral. The first and second of these requirements are not in dispute in the present case. The plan clearly provides for Berkeley to retain the lien which secures its secured claim. Additionally, the value of the collateral is not at issue because for purposes of the plan the Debtor used the $4,900,000.00 valuation of the Shopping Center arrived at by Berkeley's appraiser. The plan payment proposed for Berkeley on its secured claim matches this $4,900,000.00 value, thus satisfying the second requirement under § 1129(b)(2)(A)(i). However, the remaining requirement that the payments under the plan have a present value equal to the value of the collateral is in sharp dispute. Berkeley argues strenuously that the 8.25% interest rate proposed in the plan is too low and that the proposed payments to Berkeley on its secured claim therefore do not have a present value of $4,900,000.00 as required under § 1129(b)(2)(A)(i), rendering the plan unconfirmable.

The concept of "present value" recognizes the time value of money and compensates the creditor for not receiving its money today by charging an additional sum based on a rate of interest called the "discount rate." The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Therefore, in determining the discount rate, the court should consider the prevailing market rate for a loan of a term equal to the payoff period, with due consideration to the quality of the security and the risk of subsequent default. *See In re Bryson Properties, XVIII*, 961 F.2d 496, 500 n. 4 (4th Cir.1992), citing *In re S.E.T. Income Properties, III*, 83 B.R. 791, 793 (Bankr. N.D.Okla.1988), and 5 *Collier on Bankruptcy*, ¶ 1129.03(4)(f)(i) (15th Ed.1990) at 1129–85. While agreeing that for the purposes of cram down, the "market rate" must be used in order to satisfy the present value requirement, the cases have taken different approaches to determining the "market rate." *See* Neal Batson, "Selected Issues in Single–Asset Real Estate Cases," 6 J.Bankr.L. & Proc. 3, 45 (1996). One such approach is the "time value of money approach" or "formula

approach" to determining market rate under which the court takes an appropriate risk-free interest rate such as a treasury bond with a maturity matched to the term of payment proposed by the reorganization plan and then adds an upward adjustment to account for the risk associated with the debtor, the plan, and the security for the loan. *See Farm Credit Bank v. Fowler*, 903 F.2d 694 (9th Cir.1990); *United States v. Doud*, 869 F.2d 1144 (8th Cir.1989); *In re Oaks Partners, Ltd.*, 135 B.R. 440, 445–447 (Bankr. N.D.Ga.1991); *In re Jordan*, 130 B.R. 185, 192 (Bankr.D.N.J.1991); *In re Underwood*, 87 B.R. 594, 600–01 (Bankr.D.Neb.1988); *In re Simmons*, 86 B.R. 160, 162 (Bankr. S.D.Iowa 1988); *In re Milleson*, 83 B.R. 696, 698–99 (Bankr.D.Neb.1988) (cost of funds to creditor plus 3.5% risk factor); *In re Moore*, 81 B.R. 513, 515–16 (Bankr.S.D.Iowa 1988) (treasury bond rate plus 2.5% risk factor); *Federal Land Bank v. Bartlesmeyer (In re Bartlesmeyer)*, 78 B.R. 975, 977 (Bankr. W.D.Mo.1987) (treasury bond rate plus 1% risk factor); *In re Wichmann*, 77 B.R. 718, 720–22 (Bankr.D.Neb.1987) (treasury bond rate plus 2% risk factor); *In re Noe*, 76 B.R. 675, 678–79 (Bankr.N.D.Iowa 1987) (government securities plus 2% risk factor). The witnesses for both the Debtor and Berkeley used this approach in their testimony and this is the approach which the court will follow in the present case.

Before addressing the particulars of the testimony of the witnesses who testified regarding the interest rate issues, certain background facts which were shown at the hearing should be noted. There is an ongoing dispute between the Debtor and Rose's regarding the status of Rose's as a tenant in the Shopping Center. In approximately April of 1994, while Rose's was still a Chapter 11 debtor in its own Chapter 11 case, Rose's approached the Debtor regarding a reduction of the rent called for under the lease between Rose's and the Debtor. Rose's requested a rent reduction under which its rent would be reduced by $100,000.00 per year for the first three years, by $75,000.00 per year for the next two years and by $50,000.00 for the sixth year. It is sharply disputed whether the Debtor agreed to this reduction. Rose's contends that the

Debtor did agree to such a modification and that Rose's thereafter assumed the lease as modified. The Debtor, on the other hand, contends that it never agreed to any modification and that when Rose's assumed the lease, it assumed the lease according to its original terms. This dispute is the subject matter of a pending adversary proceeding between the Debtor and Rose's. Meanwhile, Rose's is paying rent at the reduced rate provided for in the disputed modification. It is the position of Rose's that if the Debtor prevails on the issue of whether the lease was modified, Rose's will seek a modification of the order which permitted the assumption of the lease in order to be permitted to reject the lease. It is Debtor's position that if Rose's is successful in its contention that the Debtor agreed to modify the lease, then the Debtor may decide to reject the modified lease in the Debtor's Chapter 11 case. Debtor contends that these unresolved issues create uncertainty as to whether Rose's will remain as a tenant in the Shopping Center and, if it does, the amount of rent which Rose's will pay in the future. As a result, the Debtor chose to include in its disclosure statement five schedules setting forth five different sets of financial projections based upon five different factual scenarios that could arise, depending upon how the dispute between the Debtor and Rose's is resolved in the future.

In Schedule 2, the Debtor sets forth financial projections for the five-year plan period which would result if the bankruptcy plan is approved on January 1, 1997; excess cash from the Shopping Center is forwarded to Berkeley through December 31, 1996; the Shopping Center operates with the Rose's space vacant beginning January 1, 1997 for the entire five-year plan period; and the spaces currently vacant are rented in 1996 and enhance income by $50,000.00 annually beginning January 1, 1997 ("the Schedule 2 scenario"). The Debtor refers to this as the "worst case" scenario.

In Schedule 3, the Debtor sets forth financial projections for the five-year plan period which would result if the bankruptcy plan is approved on January 1, 1997; excess cash from the Shopping Center is forwarded to

Berkeley through December 31, 1996; the Shopping Center fills currently vacant space to enhance income by $50,000.00 by the end of 1996; Lowe's refits (at its expense) the Rose's space and pays rent at the current Rose's rate; current Lowe's space is refitted for $150,000.00 and rented to small and medium tenants at $7.25 per foot completed by the end of 1997 and the Shopping Center uses maintenance and upfit reserves to pay some of the upfit costs ("the Schedule 3 scenario").

In Schedule 4, the Debtor sets forth financial projections for the five-year plan period which would result if the bankruptcy plan is approved on January 1, 1997; excess cash from the Shopping Center is forwarded to Berkeley through December 31, 1996; the Shopping Center fills currently vacant space to enhance income by $50,000.00 by the end of 1996; and Rose's accepts the Debtor's demand to go back to its original lease terms and the Lowe's lease remains the same ("the Schedule 4 scenario").

In Schedule 5, the Debtor sets forth financial projections for the five-year plan period which would result if the bankruptcy plan is approved on January 1, 1997; excess cash from operations is forwarded to Berkeley through December 31, 1996; the Shopping Center fills currently vacant space to enhance income by $40,000.00 by the end of 1997; Rose's accepts the Debtor's demand to go back to the original lease terms; and Lowe's expands to fill adjacent space and adds new space to increase rent by $40,000.00 ("the Schedule 5 scenario").

In Schedule 6, the Debtor sets forth financial projections for the five-year plan period which would result if the bankruptcy plan is approved on January 1, 1997; excess cash from the Shopping Center is forwarded to Berkeley through December 31, 1996; the Shopping Center fills currently vacant space to enhance income by $50,000.00 by the end of 1996; Lowe's refits (at its expense) the Rose's space and pays rent at the rate provided for in the Rose's lease; and current Lowe's space become vacant on 6/30/97 and remains vacant during the remainder of the five-year plan period ("the Schedule 6 scenario").

The Debtor and Berkeley each called a witness to testify regarding the appropriate market rate of interest. Richard L. Crouse was called by the Debtor. James R. Graham was called by Berkeley. The court found both witnesses to be experts. Both witnesses arrived at their opinions regarding the market interest rate by using the rate of interest for a risk free five-year treasury bill as the starting point and adding to that rate of interest the appropriate number of basis points to reflect the risk associated with the proposed secured loan under the plan. Both witnesses referred to the amount to be added to the T-bill rate as the "spread." Both witnesses agreed that the treasury bill yield to be used in arriving at the market rate of interest was 6.13% to 6.17%. Beyond this point the testimony of the two witnesses diverged significantly. Mr. Crouse, the witness called by the Debtor, opined that the market rate was between 8.05% and 8.65%, depending upon which of the plan scenarios was utilized. Under the Schedule 2 scenario, Mr. Crouse testified that the market rate would be 8.15% to 8.30%; that under the Schedule 3 scenario, the market rate would be 7.90% to 8.15%; that under the Schedule 4 scenario, the market rate would be 8.40% to 8.65%; that under the Schedule 5 scenario, the market rate would be 8.4% to 8.65% and that under the Schedule 6 scenario, the market rate would be 8.05% to 8.2%. According to Mr. Graham, the Berkeley witness, market rate in this case is 9.13% to 9.17%. In reaching his opinion, Mr. Graham talked to ten lenders and obtained from at least five of them the spread which they would use in making the secured loan proposed in the plan in this case. In obtaining quotes from these lenders, Mr. Graham used the description of the Shopping Center contained in the appraisal done by Martin & Associates in March of 1996 (Berkeley Exhibit 2), which described the Shopping Center as having a total area of 134,229 square feet, with a 54,000 square foot Rose's store, a 31,759 square foot Lowe's Foods Store, and the remainder of the space occupied by Rack Room Shoes, Boone Drug, and Prime Time Video and other shop type tenants including three local restaurants and having a current

vacancy at an overall rate of 8.4% or 23.3% of the shop space.

Having carefully considered all of the evidence which was offered on the issue of the market rate of interest in this case, the court is not convinced that the 8.25% rate of interest which the Debtor proposes to pay Berkeley on its secured claim represents the market rate of interest. As the proponent of the plan, Debtor had the burden of showing by the greater weight of the evidence that the deferred payments to Berkeley under the plan have a present value as of the effective date of the plan equal to the value of Berkeley's interest in the collateral, i.e., $4,900,-000.00. In order to carry this burden of proof, it was incumbent upon Debtor to show by the greater weight of the evidence that the proposed 8.25% rate of interest is not less than the market rate of interest for a loan of the type proposed in the plan. The Debtor failed to do so. Having failed to show that it was paying at least the market rate under the plan, Debtor failed to show that the deferred payments to Berkeley on its secured claim have a value of $4,900,-000.00 and thereby fell short of showing compliance with § 1129(b)(2)(A)(i).

In his testimony, Mr. Crouse gave varying opinions regarding the market rate based upon the various factual scenarios described in Schedules 2 through 6 of the disclosure statement. Some of the market rates supplied by Mr. Crouse were lower than 8.25% and some of his market rates were greater than 8.25%. However, none of the factual scenarios used by Mr. Crouse during his testimony purport to reflect the current status of the occupancy at the shopping center. For example, under one of the scenarios used by Mr. Crouse the Rose's space was treated as vacant for the entire plan period, while another scenario involved Rose's vacating its space and Lowe's moving into the Rose's space, thereby vacating the Lowe's space. The court is not satisfied from the evidence offered by the Debtor that any of these hypothetical scenarios are anything more than conjecture. Currently, the Rose's space is not vacant. It is occupied by Rose's and Rose's currently is paying base rent of $129,-500.00 per year under a lease that extends

past the plan period. The specter of the space occupied by Rose's becoming vacant is something that was raised by the Debtor. However, there was no showing of a likelihood of the Rose's space becoming vacant unless the Debtor should voluntarily cause such vacancy to occur by rejecting the Rose's lease and forcing Rose's out of the Shopping Center. It is inconceivable that the Debtor would follow such a course of action unless it had a more attractive replacement tenant waiting in the wings. The scenarios involving Lowe's moving into space vacated by Rose's or Lowe's moving into other vacant space were hypothetical matters which the evidence left as pure conjecture rather than events which were likely to occur. The court believes that the opinion expressed by Mr. Ingram was derived from assumptions regarding the Shopping Center which more closely resemble the actual situation at the Shopping Center. It does appear that Mr. Ingram assumed a slightly higher vacancy rate for the shop space than exists at the Shopping Center. Nevertheless, the 9.13% to 9.17% market rate expressed by Mr. Graham appears much closer to the actual market rate of interest than the market rates provided by Mr. Crouse or the 8.25% interest rate used in the plan.

The "spread" or risk premium which is appropriate in determining the market rate of interest is tied closely to the particular facts of the case. In general, the risk factor depends on the amount and quality of the collateral, the risk of default and the length of the payout period. *See In re River Village Associates,* 161 B.R. 127, 139 (Bankr. E.D.Pa.1993), *aff'd,* 181 B.R. 795 (E.D.Pa. 1995); *In re SM 104 Limited,* 160 B.R. 202, 232 (Bankr.S.D.Fla.1993); *In re Villa Diablo Associates,* 156 B.R. 650, 653 (Bankr. N.D.Cal.1993); *In re Bloomingdale Partners,* 155 B.R. 961 (Bankr.N.D.Ill.1993). As these cases recognize, the risk associated with a secured loan is increased significantly where the loan to value ratio is 100%. That factor, of course, is present in the case now before the court. The quality of the collateral also is negatively affected where one or more of the major tenants in a shopping center which secures a loan is not a high-

grade tenant. That factor, too, is present in this case. Rose's, one of two major tenants in the Shopping Center, cannot be regarded as a high-grade tenant. As reflected in the evidence, Rose's recently emerged from Chapter 11 and interjects risk in the present case which would not be present with a stronger tenant. Both of these factors increase the risks associated with the proposed loan in the present case and tend to support the higher market rates contained in the testimony of Mr. Graham.

 The Debtor argues that the plan also satisfies the requirement of § 1129(b)(2)(A)(iii) because it provides for the realization by Berkeley of the indubitable equivalent of its secured claim. If, as the court has concluded, the deferred payments to Berkeley under the plan do not have a present value equal to the value of Berkeley's $4,900,000.00 security interest then it follows that such payments are not the indubitable equivalent of the secured claim of Berkeley. *See* 5 *Collier on Bankruptcy* § 1129.03 at p. 1129–89 (15th ed. 1996) ("treatment which is less favorable than the treatment specified in § 1129(b)(2)(A)(i) and (ii) would not satisfy the test [of indubitable equivalence]"). In short, the plan treatment for the secured claim of Berkeley does not satisfy either facet of § 1129(b)(2)(A). Therefore, it follows that the plan is not fair and equitable with respect to the secured claim of Berkeley and may not be confirmed over the objection of Berkeley pursuant to § 1129(b)(2).

D. Whether the plan is fair and equitable as to Berkeley's unsecured claim.

 Where the dissenting class consists of unsecured claims, the minimum that is required in order for the plan to be fair and equitable is described in § 1129(b)(2)(B). Under this provision, the plan must satisfy one of two requirements. Either (i) the plan must provide for payment in full of the allowed amount of the unsecured claims in the dissenting class; or (ii) the holder of any claim or interest junior to the claims of the dissenting class may not receive or retain any property or interest on account of such junior claim or interest. The effect of the second requirement set forth in § 1129(b)(2)(B)(ii) is to impose a priority rule which prohibits equityholders or junior creditors from retaining "property" in the Debtor on account of their claim or interest unless senior creditors are satisfied in full. Berkeley argues that the limited partners in the present case are receiving property under the plan because of their prior interest in violation of the priority rule embodied in § 1129(b)(2)(B)(ii). The Debtor contends that the partners in this case are putting new money into the debtor and are not receiving or retaining any interest on account of their old interests in the Debtor. The Debtor also argues that the present case falls within the new value exception to the priority rule set forth in § 1129(b)(2)(B)(ii). Berkeley counters with the argument that the new value exception no longer exists. These conflicting positions require an examination of the exact nature of the priority rule contained in § 1129(b)(2)(B) as well as a consideration of the extent to which there is a new value exception to the priority rule contained in § 1129(b)(2)(B).

 In *In re Bryson Properties, XVIII,* 961 F.2d 496 (4th Cir.1992), the Fourth Circuit observed that § 1129(b)(2)(B)(ii) is a codification of the absolute priority rule which existed in the case law prior to the enactment of the Bankruptcy Code. Under the absolute priority rule a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a plan of reorganization "on account of" their prior interest. *Id.* at 503. In applying the absolute priority rule in *Bryson* the court held that the rule was violated where the plan gave the old equityholders the exclusive right to contribute new capital because the "exclusive right to contribute constitutes 'property' under § 1129(b)(2)(B)(ii), which was received or retained on account of a prior interest." *Id.* at 504. The Debtor argues that this ruling is not applicable in the present case because the plan does not grant old equity the exclusive right to contribute. Instead, according to the Debtor, the plan gives Berkeley the same participation rights in the reorganized debtor that are afforded to Debtor's original limited and general partners. The actual

provisions of the plan do not bear out these assertions. It is true that under Alternative B of the Berkeley plan treatment Berkeley may elect to "participate in the partnership" and purchase 29% of the new limited partner units in the reorganized debtor. However, before Berkeley may do so it must "forego treatment under the plan of its Allowed Unsecured Deficiency Claim." (Plan, p. 10). In other words, before Berkeley may invest in the reorganized debtor it must forego or surrender its entire $1,444,402.00 unsecured claim for the opportunity of buying 29% of the new partnership units at the same price per unit as the old equity. Thus, to get 29% of the new partnership units Berkeley must forego a claim of $1,444,402.00 and pay new capital of $58,000.00. At the same time the old partners get to compound their original investment at an annual rate of 9.65% for the six years they have been partners, thereby gaining the right to purchase 69% of the new partnership units. The Debtor's disclosure statement states that this result places Berkeley in the "same position" as the limited partners. (Disclosure Statement, p. 15). If so, it represents a flaw in the plan. The essence of the absolute priority rule is that equityholders and unsecured creditors cannot be treated the same—a plan cannot put them in the "same position" without violating the rule. In the present case, the portion of the plan which purports to open the door for investment in the reorganized debtor is impermissibly tied to a provision which in effect requires that the unsecured creditor agree to be treated as an equityholder rather than a creditor before that creditor can invest new money in the reorganized debtor. Section 1129(b)(2)(B)(ii) leaves no room for the Debtor in this case to treat Berkeley's unsecured claim the same as the risk capital which the limited partners originally placed in the Debtor as an investment and not as a loan. Such is the result when the plan requires that Berkeley surrender its claim in order to gain the right to invest in the reorganized debtor. The plan in the present case, because it imposes an impermissible condition upon Berkeley investing in the reorganized

debtor, creates a right on the part of the old equityholders which, if not an exclusive right to invest, does constitute the receipt or retention of "property" on account of their prior interest in the Debtor. As a practical matter, to require Berkeley to forego its entire unsecured claim in order to be able to "invest" in the Debtor, arguably is tantamount to giving the old equityholders an exclusive right to invest. At the very least, it is a "special opportunity" for the old equityholders derived on account of their prior interest in the Debtor which constitutes a clear violation of the absolute priority rule under the decision reached by the Fourth Circuit in the *Bryson* case. *See also In re Lumber Exchange Ltd. Partnership*, 125 B.R. 1000, 1008 (Bankr.D.Minn.), *aff'd* 134 B.R. 354 (D.Minn.1991) (special opportunity for equityholders to retain or acquire interest through new cash contribution necessarily is a right to receive or retain property on account of prior interest).

Although the court believes that the new value exception to the absolute priority rule survived the enactment of the Bankruptcy Code in 1978,[4] the existence of the exception does not alter the outcome of the present case because the Debtor failed to establish the applicability of the new value exception. In order for old equityholders to retain their interest pursuant to the new value exception to the absolute priority rule, the capital contribution must be new, it must be made in money or money's worth, it must be necessary for a successful reorganization and the new contribution must be substantial and reasonably equivalent to the value or interest which the old equityholders are receiving under the plan. *E.g., In re One Times Square Associates Ltd. Partnership*, 159 B.R. 695, 707 (Bankr.S.D.N.Y.1993). In the present case, there are several reasons why the new value exception is not applicable even though the plan necessarily provides for the old equityholders to infuse $360,000.00 in cash. In the first instance, it should be noted that in the *Bryson* case, the court ruled that the new value exception would not

---

**4.** *See In re Bonner Mall Partnership*, 2 F.3d 899 (9th Cir.1993); *In re Gramercy Twins Associates*, 187 B.R. 112 (Bankr.S.D.N.Y.1995); *In re Union* *Meeting Partners*, 165 B.R. 553 (Bankr.E.D.Pa. 1994), *aff'd*, 52 F.3d 317 (3rd Cir.1995).

be applicable under the facts of that case. In that regard, the court stated:

Finally, while it is not impermissible to propose a plan which only adjusts the interests of one creditor, this situation certainly must cause a court to scrutinize closely the equities involved. Under the Plan or through outside payments, the claims of all creditors, other than Travelers, will be paid in full. Only Travelers is truly impaired. This combination of factors leads us to conclude that even if some limited new capital exception were viable under the Bankruptcy Code, it would not be so expansive as to apply under the facts of this case. A plan must be fair and equitable in a broad sense, as well as in the particular manner specified in 11 U.S.C. § 1129(b)(2). Here, the debtors have carried their opportunity for self-dealing too far.

In re Bryson Properties, XVIII, 961 F.2d at 505. In the present case, the claims of all unrelated creditors other than Berkeley are being paid in full. The only creditor who is significantly impaired is Berkeley and, while the plan does not explicitly give the old equityholders the exclusive right to invest, the effect of the plan is to impose an impermissible condition on Berkeley doing so involving the total loss of its entire unsecured deficiency claim in order for Berkeley to invest. This combination of factors is similar to the factors involved in the Bryson case and leads this court to conclude, as the court did in Bryson, that "even if some limited new capital exception were viable under the Bankruptcy Code" it is not applicable in the present case.

An additional reason why the new value exception may not be invoked in the present case involves the requirement that the capital contribution be reasonably equivalent to the value of the interest retained or received by the old equityholders. The very substantial disparity between the $360,000.00 contribution being made in this case and the $4,900,000.00 value of the Shop-

ping Center raises a serious question regarding the applicability of the new value exception. See In re Miami Center Associates, Ltd., 144 B.R. 937 (Bankr.S.D.Fla.1992) (new value exception not applicable where the contribution was $2,000,000.00 and the retained asset had a value of $18,500,000.00); In re One Times Square Associates Ltd. Partnership, 159 B.R. 695 (Bankr.S.D.N.Y.1993) (new value exception not applicable where the contribution was $2,400,000.00 and the value of the retained asset was $19,000,000.00). The $360,000.00 contribution in the present case is even less a percentage of the value of the retained asset than was the case in either of the foregoing decisions. Furthermore, in both of these decisions, the fact that the plan reserved the upside potential for the debtor while forcing the lender to bear the risk of the reorganization, also was a significant factor in finding that the new value exception was not applicable and that the plan was not fair and equitable. That same situation exists in the present case. Under the plan in the present case, Berkeley bears the risk associated with the reorganization both as to its secured claim as well as its unsecured claim. As to its secured claim, the $4,900,000.00 principal indebtedness will be reduced only $231,086.00 during the course of the plan period.[5] Thus, at the end of the five-year plan period, Berkeley will have an unpaid balance of $4,668,914.00 on its secured claim and will face the risk of the Debtor being unable to pay the $4,668,914.00 balloon payment as well as the risk that the Shopping Center may not be worth $4,668,914.00 at that time. With respect to its unsecured claim, Berkeley is assured of receiving only $160,000.00 under the plan, the amount of the initial payment. Thereafter, its dividend is a percentage of the net operating income of the Shopping Center. If the Shopping Center does not do well, then that additional payment may be small or nonexistent. Moreover, and perhaps most unfairly of all, under the plan, if the Shopping Center is sold or refinanced then Berkeley's entire unsecured

5. See Schedules 2 through 6 which show the total payments which will be made on the se-

cured claim and the portion of those payments

claim is deemed satisfied and goes away.[6] On the other hand, under all of the scenarios contained in the schedules attached to the disclosure statement, the Shopping Center is projected to generate excess cash from operations after the debt service has been satisfied. Under the plan Berkeley is to receive only 30% of this cash, whether it elects to be a new limited partner under Alternative B or an unsecured creditor under Alternative A. The remaining 70% goes to the benefit of the existing equityholders, either as partnership distributions or through payments on their prepetition unsecured claims. Thus, under either Alternative A or Alternative B of the plan, Berkeley stands to receive only 30% of the cash from operations after debt service, while the old equityholders are to receive the benefit of the remaining 70%. Given these circumstances, the court is unable to find from the evidence adduced at the confirmation hearing that the contribution of the old equityholders is reasonably equivalent to the interest being retained by the old equityholders under the plan. As the proponent of the plan, the burden of proof was on the Debtor to satisfy the court by the greater weight of the evidence that the contribution being made by the old equityholders was reasonably equivalent to the interest retained. *See In re Montgomery Court Apartments of Ingham County, Ltd.,* 141 B.R. 324, 345–46 (Bankr.S.D.Ohio 1992). In order to carry this burden, it was incumbent upon the Debtor to establish the value of the interest retained by the old equityholders. Such retained interest includes the fact that the old equityholders, upon making the contribution, acquire the right of future participation in the Debtor. The value of such future participation in large measure determines the value of the interest retained by the shareholders for purposes of the new value exception. In the present case, the evidence offered at the hearing did not establish that the $360,-000.00 contribution in this case is reasonably equivalent to the value of the right to future participation in the Debtor, the interest being retained by the old equityholders. To the contrary, considering the value of the Shopping Center and the anticipated cash distributions suggested by Debtor's projections, particularly when the anticipated rents from Rose's are included in the figures,[7] the

---

that go toward interest. The balance of the payments serve to reduce principal.

**6.** See Second Amended Plan or Reorganization, Debtor's Ex. 9 at p. 10, and Modified Disclosure Statement to Second Amended Plan of Reorganization, Debtor's Ex. 10 at p. 20. This provision conflicts with § 1111(b) of the Bankruptcy Code. As pointed out in *In re Aztec Co.,* 107 B.R. 585, 592 (Bankr.M.D.Tenn.1989), § 1111(b) was enacted to alter the result under former Chapter XII which permitted a debtor to write down nonrecourse notes secured by real estate to the value of the collateral, discharge the deficiency and retain for the owners any future increase in the value of the collateral. Section 1111(b) was intended to change this opportunity by giving the undersecured holder of a non-recourse claim an option to elect to have its entire claim treated as secured or to have a secured claim for the value of the collateral and an unsecured deficiency claim that exist only in the Chapter 11 case. As was its right under § 1111(b), Berkeley chose the option of having a secured claim for the value of the Shopping Center and an unsecured deficiency claim for the balance of its note, *to wit,* $1,444,402.00. Debtor's effort to eliminate the unsecured claim upon the sale or refinancing of the Shopping Center is contrary to § 1111(b) and renders the plan unfair, inequitable and unconfirmable. Further, since such a provision contravenes § 1111(b), it could be argued that the plan also fails to satisfy the requirement in

§ 1129(a)(1) that the plan comply with the applicable provisions of Title 11.

**7.** For example, if the *reduced* rents being paid by Rose's are added to the figures contained in Debtor's "worst case" scenario as set forth in Schedule 2, the Debtor's net rental income picture improves significantly as does the return for the partners. In 1997, the first year of the plan, the reduced base rents to be paid by Rose's total $129,500.00. After deducting the 3% rental commission being paid by Debtor, the net rental income for the Shopping Center increases by the sum of $125,615.00 as a result of the inclusion of the reduced rents being paid by Rose's. In 1998 and 1999 the rents being paid by Rose's increases by $25,000.00 each year to $154,500.00 per year, because the reduction is only $75,000.00 per year during those years. In 2000, the reduced Rose's rents increase to $179,500.00 because the reduction is only $50,000.00 that year. Beginning in 2001 Rose's begins to pay the full base rental of $229,500.00. The inclusion of the rents to be paid by Rose's thus results in a net increase of $125,615.00 in 1997, $149,865.00 in 1998, $149,865.00 in 1999, $174,115.00 in 2000 and $222,615.00 in 2001. The partners are projected to receive 70% of the net rents which means that the partners stand to receive an additional $87,930.50 in 1997, an additional $104,-905.50 in 1998, an additional $104,905.50 in 1999, an additional $121,880.50 in 2000 and an

evidence strongly suggests that $360,000.00 is not reasonably equivalent to the interests being retained by the partners in the present case. Since the Debtor and the Committee failed to establish that the infusion of capital under the plan is reasonably equivalent to the interest being retained by the existing partners, the requirements for the new value exception to the absolute priority rule are not met in the present case. Therefore, the plan in the present case also violates § 1129(b)(2)(B)(ii) of the Bankruptcy Code and is not confirmable for that additional reason.

## CONCLUSION

For the reasons herein set forth, an order will be entered contemporaneously with the entry of this memorandum opinion denying confirmation of Debtor's second amended plan.

additional $155,830.50 in 2001. These are very substantial returns for the partners which result in the partners recovering their entire $360,-000.00 before the end of the plan period. At the same time, the unsecured creditor with an undisputed claim of $1,444,402.00 would receive less than 35% of its claim.